# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 12, 2011

No. 09-30036

Lyle W. Cayce
Clerk

OREN ADAR, Individually and as Parent and Next Friend of
J C A-S a minor; MICKEY RAY SMITH, Individually and as Parent and
Next Friend of J C A-S a minor

Plaintiffs - Appellees

v.

DARLENE W SMITH, In Her Capacity as State Registrar and
Director, Office of Vital Records and Statistics, State of Louisiana
Department of Health and Hospitals

Defendant - Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana

Before JONES, Chief Judge, and REAVLEY, JOLLY, DAVIS, SMITH, WIENER,
GARZA, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN,
ELROD, SOUTHWICK and HAYNES, Circuit Judges.[*]

EDITH H. JONES, Chief Judge:

Mickey Smith and Oren Adar, two unmarried individuals, legally adopted
Louisiana-born Infant J in New York in 2006. They sought to have Infant J's
birth certificate reissued in Louisiana supplanting the names of his biological
parents with their own. According to La. Rev. Stat. Ann. § 40:76(A), the

[*] Judge King and Judge Graves did not participate in this decision.

No. 09-30036

Registrar "may create a new record of birth" when presented with a properly certified out-of-state adoption decree. Subsection C states that the Registrar "shall make a new record . . . showing," inter alia, "the names of the adoptive parents." LA. REV. STAT. ANN. § 40:76(C). Darlene Smith, the Registrar of Vital Records and Statistics, refused their request.[1] The Registrar took the position that "adoptive parents" in section 40:76(C) means married parents, because in Louisiana, only married couples may jointly adopt a child. LA. CHILD. CODE ANN. art. 1221. She offered, however, to place one of Appellees' names on the birth certificate because Louisiana also allows a single-parent adoption. Smith and Adar sued the Registrar under 42 U.S.C. § 1983 for declaratory and injunctive relief, asserting that her action denies full faith and credit to the New York adoption decree and equal protection to them and Infant J.

The district court ruled in favor of Smith and Adar on their full faith and credit claim. Following the Registrar's appeal, a panel of this court pretermitted the full faith and credit claim, concluding instead that Louisiana law, properly understood, required the Registrar to reissue the birth certificate. This panel opinion was vacated by our court's decision to rehear the case en banc. *Adar v. Smith*, 622 F.3d 426 (5th Cir. 2010).

This court must decide whether Appellees' claim for a reissued Louisiana birth certificate rests on the Constitution's full faith and credit clause or equal protection clause. Confusion has surrounded the characterization of Appellees' claims and their jurisdictional basis. Rather than parse the litigation history in detail, this discussion will demonstrate the following propositions:

---

[1] The Registrar's duty to maintain vital statistics and records is created within Louisiana's Public Health and Safety Law. LA. REV. STAT. ANN. tit. 40, ch. 2.

No. 09-30036

1.    Appellees have standing to sue for themselves and/or Infant J;

2.    The federal courts have jurisdiction to decide whether Appellees stated a claim remediable under § 1983 for violation of the full faith and credit clause;

3.    Appellees' complaint does not state such a claim; and

4.    Appellees have failed to state a claim that the Registrar's action denied them equal protection of the laws.

We REVERSE and REMAND for entry of a judgment of dismissal by the district court.

## I.    FULL FAITH AND CREDIT

### A.  Justiciability

The Registrar initially contends that Appellees lack standing to sue and that the federal courts lack jurisdiction over the full faith and credit claim.  The threshold justiciability questions are novel, but settled principles guide their resolution.

In order to establish standing, plaintiffs must show that (1) they have suffered an injury in fact, (2) a causal connection exists between the injury and challenged conduct, and (3) a favorable decision is likely to redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 295 (5th Cir. 2001). We find Appellees have standing because they have been denied a revised birth certificate containing the names of both Smith and Adar as parents–the practical significance of which is undisputed–and through this action seek to redress the denial directly.  Because standing does not depend upon ultimate success on the merits, Appellees are properly before this court.  *See Warth v. Seldin*, 422 U.S.

3

No. 09-30036

490, 500, 95 S. Ct. 2197, 2206 (1975); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385 (5th Cir. 1986) ("It is inappropriate for the court to focus on the merits of the case when considering the issue of standing.").

Further, the court must assume jurisdiction to decide whether Appellees' complaint states a cause of action on which relief can be granted. *Bell v. Hood*, 327 U.S. 678, 681-82, 66 S. Ct. 773, 776 (1946). Since the absence of a valid cause of action does not necessarily implicate subject-matter jurisdiction unless the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 118 S. Ct. 1003, 1010 (1998) (quoting *Bell*, 327 U.S. at 682-83, 66 S. Ct. at 776), we may determine whether plaintiffs have alleged an actionable claim under the full faith and credit clause. *See Thompson v. Thompson*, 484 U.S. 174, 178-79, 108 S. Ct. 513, 516 (1988) (affirming dismissal of full faith and credit suit for failure to state a claim).

## B. Full Faith and Credit

The questions at issue are the scope of the full faith and credit clause and whether its violation is redressable in federal court in a § 1983 action.

Appellees contend that their claim arises under the full faith and credit clause, effectuated in federal law by 28 U.S.C. § 1738. The Constitution's Article IV, § 1 provides:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

In pertinent part, the statute states:

No. 09-30036

**§ 1738.    State and Territorial statutes and judicial proceedings; full faith and credit.**

. . .

Such Acts, records and judicial proceedings or copies thereof [of any State, Territory, or Possession of the United States], so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

28 U.S.C. § 1738.

Infant J was adopted in a court proceeding in New York state, as evidenced by a judicial decree. Appellees contend that Art. IV, § 1 and § 1738 oblige the Registrar to "recognize" their adoption of Infant J by issuing a revised birth certificate. The Registrar declined, however, to enforce the New York decree by altering Infant J's official birth records in a way that is inconsistent with Louisiana law governing reissuance. *See* LA. REV. STAT. ANN. § 40:76; LA. CHILD. CODE ANN. arts. 1198, 1221. Appellees argue that either the Registrar's refusal to issue an amended birth certificate with both names on it, or the state law on which she relied, effectively denies them and their child "recognition" of the New York decree. Thus, the Registrar, acting under color of law, abridged rights created by the Constitution and laws of the United States. 42 U.S.C. § 1983.

This train of reasoning is superficially appealing, but it cannot be squared with the Supreme Court's consistent jurisprudential treatment of the full faith and credit clause or with the lower federal courts' equally consistent approach. Simply put, the clause and its enabling statute created a rule of decision to govern the preclusive effect of final, binding adjudications from one state court

5

No. 09-30036

or tribunal when litigation is pursued in another state or federal court. No more, no less. Because the clause guides rulings in courts, the "right" it confers on a litigant is to have a sister state judgment recognized in courts of the subsequent forum state. The forum's failure properly to accord full faith and credit is subject to ultimate review by the Supreme Court of the United States. Section 1983 has no place in the clause's orchestration of inter-court comity—state courts may err, but their rulings are not subject to declaratory or injunctive relief in federal courts.

Alternatively, even if the Supreme Court were inclined for the first time to find a claim of this sort cognizable under § 1983, the Registrar did not violate the clause by determining how to apply Louisiana's laws to maintain its vital statistics records. As the Supreme Court has clarified, "Enforcement measures do not travel with the . . . judgment." *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 235, 118 S. Ct. 657, 665 (1998). The Registrar concedes it is bound by the New York adoption decree, such that the parental relationship of Adar and Smith with Infant J cannot be relitigated in Louisiana. That point is not at issue here. There is no legal basis on which to conclude that failure to issue a revised birth certificate denies "recognition" to the New York adoption decree.

> **1.      *The full faith and credit clause imposes an obligation on courts to afford sister-state judgments res judicata effect.***

To explain these conclusions, we begin with the history and purpose of the full faith and credit clause. Under the common law, the concept of "full faith and credit" related solely to judicial proceedings. In particular, "the terms 'faith' and 'credit' were generally drawn from the English law of evidence and employed to describe the admissibility and effect of items of proof." Ralph U. Whitten, *The Original Understanding of the Full Faith and Credit Clause and the Defense of*

6

No. 09-30036

*Marriage Act*, 32 CREIGHTON L. REV. 255, 265 (1998).   These terms were incorporated into the Constitution in the full faith and credit clause.

Early on, the phrase "full faith and credit," when used in conjunction with a judgment, indicated either that a judgment would be given a conclusive, or res judicata, effect on the merits, or that the judgment, when properly authenticated, would "simply be admitted in to [sic] evidence as proof of its own existence and contents, leaving its substantive effect to be determined by other rules." *Id.* at 267.  The Supreme Court soon rejected the argument that full faith and credit obligations entailed a mere evidentiary requirement, and instead held that state courts would be obliged to afford a sister-state judgment the same res judicata effect which the issuing court would give it.  *Mills v. Duryee*, 11 U.S. (7 Cranch) 481, 485, 3 L. Ed. 411 (1813) (Story, J.);  *Hampton v. McConnel*, 16 U.S. (3 Wheat.) 234, 235, 4 L. Ed. 378 (1818) (Marshall, C.J.).  Since then, adhering to the original purpose of the clause, the Court has interrelated the requirement of "full faith and credit" owed to judgments with the principles of res judicata.

According to the Court, the purpose of the clause was to replace the international law rule of comity with a constitutional duty of states to honor the laws and judgments of sister states.  *Estin v. Estin*, 334 U.S. 541, 546, 68 S. Ct. 1213, 1217 (1948) (the full faith and credit clause "substituted a command for the earlier principles of comity and thus basically altered the status of the States as independent sovereigns").  With respect to judgments, this meant that other states' courts were obliged "to honor" the "res judicata rules of the court that rendered an initial judgment."  18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4403, at 44 (2d ed.

No. 09-30036

2002) [hereinafter "WRIGHT & MILLER"]; *Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 439, 64 S. Ct. 208, 214 (1943) (noting that "the clear purpose of the full faith and credit clause" was to establish the principle that "a litigation once pursued to judgment shall be as conclusive of the rights of the parties in every court as in that where the judgment was rendered"). The clause thus became the "vehicle for exporting local res judicata policy to other tribunals." 18B WRIGHT & MILLER § 4467, at 14; *see also Magnolia Petroleum Co.*, 320 U.S. at 438, 64 S. Ct. at 213 (stating that full faith and credit clause and implementing statute "have made that which has been adjudicated in one state res judicata to the same extent in every other").

Without the clause, unsuccessful litigants could have proceeded from state to state until they obtained a favorable judgment, capitalizing on state courts' freedom to ignore the judgments of sister states. But, as the Court put it, the full faith and credit clause brought to the Union a useful means of ending litigation by making "the local doctrines of res judicata . . . a part of national jurisprudence." *Durfee v. Duke*, 375 U.S. 106, 109, 84 S. Ct. 242, 244 (1963) (quoting *Riley v. N.Y. Trust Co.*, 315 U.S. 343, 349, 62 S. Ct. 608, 612 (1942)).

The Court still maintains that the clause essentially imposes a duty on state courts to give a sister-state judgment the same effect that the issuing court would give it. *Thompson*, 484 U.S. at 180, 108 S. Ct. at 517 ("[T]he Full Faith and Credit Clause obliges States only to accord the same force to judgments as would be accorded by the courts of the State in which the judgment was entered."); *see also Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 525, 106 S. Ct. 768, 772 (1986). Judgments thereby gain "nationwide force" for "claim and issue preclusion (res judicata) purposes." *Baker*, 522 U.S. at 233, 118 S. Ct.

8

No. 09-30036

at 664.  For this reason, a state satisfies its constitutional obligation of full faith and credit where it affords a sister-state judgment "the same credit, validity, and effect" in its own courts, "which it had in the state where it was pronounced." *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704, 102 S. Ct. 1357, 1365 (1982) (quoting *Hampton*, 16 U.S. (3 Wheat.) at 325).  The question, then, is whether this obligation gives rise to a right vindicable in a § 1983 action.  We hold that it does not.

Appellees assert that plaintiffs may employ § 1983 against any state actor who violates one's "right" to full faith and credit, since § 1983 provides remedies for the violation of constitutional and statutory rights.  Only one federal case, to be discussed later, appears to support this proposition.  *See Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007).  Other federal courts, led by the Supreme Court, have uniformly defined the "right" as a right to court judgments that properly recognize sister-state judgments; they have confined the remedy to review by the Supreme Court; and they have held that lower federal courts lack jurisdiction to preemptively enforce full faith and credit claims.[2]  All of these principles are inconsistent with stating a claim remediable by § 1983.

The Supreme Court has described the full faith and credit clause as imposing a constitutional "rule of decision" on state courts.[3]  While the Court has

---

[2] Supreme Court precedent differentiates the credit owed to laws and the credit owed to judgments.  *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 232, 118 S. Ct. 657, 663 (1998).  While the credit owed to laws implicates conflict-of-law rules, the duty with respect to judgments is simpler, in that subsequent courts must simply apply the issuing state's res judicata laws.

[3] *Thompson v. Thompson*, 484 U.S. 174, 182-83, 108 S. Ct. 513, 518 (1988) ("[T]he Clause 'only prescribes a rule by which courts, Federal and state, are to be guided when a question arises in the progress of a pending suit as to the faith and credit to be given by the court to the public acts, records, and judicial proceedings of a State other than that in which

No. 09-30036

at times referred to the clause in terms of individual "rights," it consistently identifies the violators of that right as state *courts*. *See, e.g.*, *Barber v. Barber*, 323 U.S. 77, 81, 65 S. Ct. 137, 139 (1944) ("The refusal of the Tennessee Supreme Court to give credit to that judgment because of its nature is a ruling upon a federal right."); *Magnolia Petroleum Co.*, 320 U.S. at 443, 64 S. Ct. at 216 ("When a state court refuses credit to the judgment of a sister state . . . , an asserted federal right is denied."); *Titus v. Wallick*, 306 U.S. 282, 291, 59 S. Ct. 557, 562 (1939) (same); *Tilt v. Kelsey*, 207 U.S. 43, 50, 28 S. Ct. 1, 3 (1907) (full faith and credit right was "denied by the highest court of the state"); *Hancock Nat'l Bank v. Farnum*, 176 U.S. 640, 641-42, 645, 20 S. Ct. 506, 507-08 (1900) (finding that the *supreme court of Rhode Island* denied plaintiff "a right given by § 1, article 4, of the Constitution").

The cases thus couple the individual right with the *duty of courts* and tether the right to res judicata principles. This explains the usual posture of full faith and credit cases: the issue arises in the context of pending litigation—not as a claim brought against a party failing to afford full faith and credit to a state judgment, but as a basis to challenge the forum court's decision. Such cases begin in state court, and the Supreme Court intervenes only after the *state court* denies the validity of a sister state's law or judgment.[4] *See Allen v. Alleghany Co.*, 196 U.S. 458, 464-65, 25 S. Ct. 311, 313 (1905); *Johnson v. N.Y. Life Ins.*

---

the court is sitting.'") (quoting *Minnesota v. N. Sec. Co.*, 194 U.S. 48, 72, 24 S. Ct. 598, 605 (1904)); 16 AM. JUR. 2D *Constitutional Law* § 587, at 992 (1964) (same).

[4] In cases arising under federal diversity jurisdiction, full faith and credit issues may arise because federal district courts are governed by the full faith and credit *statute*. *See Milwaukee Cnty. v. M.E. White Co.*, 296 U.S. 268, 56 S. Ct. 229 (1935); *Hazen Research, Inc. v. Omega Minerals, Inc.*, 497 F.2d 151 (5th Cir. 1974).

No. 09-30036

*Co.*, 187 U.S. 491, 495, 23 S. Ct. 194, 195 (1903) (noting that the litigant could not claim her full faith and credit "right" had been denied "until the trial took place"); *Chicago & A.R. Co. v. Wiggins Ferry Co.*, 108 U.S. 18, 23-24, 1 S. Ct. 614, 616 (1883) (no federal question arises until a state court fails to give full faith and credit to the law of a sister state).[5]   Consequently, since the duty of affording full faith and credit *to a judgment* falls on courts, it is incoherent to speak of vindicating full faith and credit rights against non-judicial state actors.[6]

Fifth Circuit law confirms this point. *See White v. Thomas*, 660 F.2d 680, 685 (5th Cir. 1981).   In *White*, this court dismissed a § 1983 claim brought against a Texas sheriff who fired the plaintiff for allegedly lying on his employment application form by failing to disclose his involvement in a juvenile crime. *Id.* at 682.   The plaintiff argued that because a California court had entered an order expunging his juvenile record, Texas state officials were obliged to treat his record as expunged.   The court held that the sheriff could not have violated the full faith and credit clause because its function was "to avoid

---

[5] *See also* 16B AM. JUR. 2D *Constitutional Law* § 1030, at 998-99 (1964) ("In order to create a reviewable federal question under the constitutional provision as to full faith and credit," plaintiff must show that "the validity of the laws of another state is drawn into question <u>by the courts</u>.") (emphasis added).

[6] One might argue that this interpretation of the clause is curious given that the Constitution addresses itself to "each state," not to "each state's courts."   Not only is this interpretation most consistent with the Supreme Court's long-standing precedent, however, but a contrary interpretation would create a serious anomaly of its own.   The Supreme Court has explicitly held that if a *court* fails to afford full faith and credit to a judgment, the appropriate path for redress is Supreme Court review. *See Thompson*, 484 U.S. 174, 108 S. Ct. 513.   If § 1983 provided a remedy for full faith and credit violations by state *executive officials*, litigants in such actions would have a considerable advantage over litigants who pursue recognition of out-of-state judgments through state courts.   Whereas the former would have immediate federal court redress through § 1983, the latter would depend on Supreme Court review alone.

No. 09-30036

relitigation of the same issue in courts of another state." *Id.* at 685. The clause did not "require a Texas *sheriff* to obey California law." *Id.* (emphasis added).

In a similar case, the Seventh Circuit denied relief under § 1983 when a plaintiff sued Illinois state police for failing to give full faith and credit to a New York judgment. *Rosin v. Monken*, 599 F.3d 574, 576 (7th Cir. 2010). The court reasoned that because the "primary operational effect of the Clause's application" was "for claim and issue preclusion (res judicata) purposes," the clause did not oblige executive officials to execute the judgment in the manner prescribed by the out-of-state judgment itself. *Id.* (quoting *Baker*, 522 U.S. at 233, 118 S. Ct. at 664).

That the obligation to afford judgments full faith and credit falls on courts is implicit from the fact that rules of res judicata provide the standard for determining whether a judgment is entitled to full faith and credit in the first place. According to the Court, a judgment is not entitled to full faith and credit unless the second court finds that the questions at issue in the first case "have been fully and fairly litigated and finally decided in the court which rendered the original judgment." *Durfee*, 375 U.S. at 111, 84 S. Ct. at 245. Further, a judgment issued by a court without jurisdiction over the subject matter, or personal jurisdiction over the relevant parties, is not entitled to full faith and credit. *Underwriters Nat'l Assurance Co.*, 455 U.S. at 705, 102 S. Ct. at 1366 ("[B]efore a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given."); *W. Union Tel. Co. v. Pennsylvania*, 368 U.S. 71, 75, 82 S. Ct. 199, 201 (1961) ("[A] state court judgment need not be given full

12

faith and credit by other States as to parties or property not subject to the jurisdiction of the court that rendered it."). The predicates triggering full faith and credit are determinable only by courts. State executive officials are unsuited and lack a structured process for conducting the legal inquiry necessary to discern whether a judgment is entitled to full faith and credit. Thus, it makes little sense to impose full faith and credit obligations on non-judicial officers who are not equipped for such a task.

Even if a broader individual right exists under the full faith and credit clause, the Court has expressly indicated that the only remedy available for violations of full faith and credit is review by the Supreme Court. *See Thompson*, 484 U.S. 174, 108 S. Ct. 513. In *Thompson*, the Court held that the Parental Kidnaping Prevention Act (PKPA)–which imposed a full faith and credit duty on states to enforce child custody determinations entered by sister-state courts–did not give rise to an implied private cause of action. The Court reasoned that because Congress had explicitly declined to rely on federal courts to enforce full faith and credit rights, the only remedy for full faith and credit violations must lie in Supreme Court review of state court decisions. *Id.* at 185-87, 108 S. Ct. at 519-20.

In making this point, the Court distinguished between enforcement of the PKPA by federal courts and a "full faith and credit approach," which simply imposed a federal duty on states vis-à-vis sister-state decrees. *Id.* The Court held that the PKPA embodied the latter approach because Congress had expressed no intention of involving federal courts in the enforcement of full faith and credit obligations. Not only did the Court find no implied private remedy in the PKPA, but it found no *statutory* remedy at all: it is "highly unlikely" that

"Congress would follow the pattern of the Full Faith and Credit Clause and section 1738 by structuring [the PKPA] as a command to state courts to give full faith and credit to the child custody decrees of other states, and yet, without comment, depart from the enforcement practice followed under the Clause and section 1738." *Id.* at 183, 108 S. Ct. at 518 (quoting *Thompson v. Thompson*, 798 F.2d 1547, 1556 (9th Cir. 1986)).

The Court implicitly acknowledged that without *some* federal cause of action, state courts could simply refuse to comply with PKPA's requirements. *Id.* at 187, 108 S. Ct. at 520. Rather than suggesting other statutes–like § 1983–could provide the remedy, the Court responded only that state courts could not completely refuse to enforce the PKPA because final review of state court decisions was available in the Supreme Court. *Id.* The Court affirmed the historic "presumption" that state courts will "faithfully administer the Full Faith and Credit Clause," *id.*, and "that the courts of the states will do what the constitution and the laws of the United States require," *Chicago & A.R. Co.*, 108 U.S. at 24, 1 S. Ct. at 616. Importantly, resort to federal courts cannot be effected "because of fear that [state courts] will not." *Id.*

Appellees downplay the significance of *Thompson*. They suggest that because that case did not involve a state actor refusing to accord full faith and credit to another state's judgment, but was a suit against a *private* individual, *Thompson* should not foreclose resort to § 1983 to remedy full faith and credit violations by state actors. In fact, the actual relief sought by the plaintiff in his suit was for the federal district court to require the "*state courts*" to comply "with the standards established by [the PKPA]." *Thompson*, 798 F.2d at 1552 (emphasis added). This procedural posture may have provoked the Supreme

14

No. 09-30036

Court to explain in great detail that Congress never intended lower federal courts to play any role in the enforcement of full faith and credit obligations. *Thompson*, 484 U.S. at 183-84, 108 S. Ct. at 518. It seems highly unlikely that the Court, having rejected a federal court full faith and credit remedy under the PKPA, would mint a § 1983 remedy in other full faith and credit cases. In fact, the Eleventh Circuit recently dismissed a § 1983 action alleging violations of the full faith and credit clause, the PKPA, and the Full Faith and Credit for Child Support Orders Act, citing *Thompson* for its holding. *Stewart v. Lastaiti*, No. 10-12571, 2010 WL 4244064 (11th Cir. Oct. 28, 2010). Consequently, the only remedy for a state's refusal to discharge its obligations under the clause remains an appeal to the Supreme Court.

Only one federal court decision has permitted a full faith and credit claim to be brought in federal court pursuant to § 1983. *Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007). In *Finstuen*, a couple sued to invalidate an Oklahoma statute that officially denied recognition to out-of-state adoptions by same-sex couples. The Tenth Circuit not only granted relief under § 1983, but also ordered a new birth certificate to be issued bearing the names of the same-sex parents. 496 F.3d at 1156. The bulk of the opinion is devoted to analysis of the allegedly unconstitutional state non-recognition statute, a problem different from the one here. Moreover, the court did not discuss, nor does it appear to have been argued, that (1) the clause has hitherto been enforced only as to court decisions denying recognition of out-of-state judgments, and (2) Supreme Court authority, cited below, denies federal question jurisdiction to full faith and credit claims.

*Finstuen* however, acknowledges the principle that "[e]nforcement measures do not travel with the sister state judgment" for full faith and credit

purposes, and it characterizes the birth certificate sought by the plaintiffs as an "enforcement mechanism". *See* 496 F.3d at 1154. In the end, *Finstuen* is distinguishable not only because the Registrar here concedes the validity of Infant J's adoption but because Louisiana law, unlike Oklahoma law, does not require issuing birth certificates to two unmarried individuals. The "enforcement measure" – issuance of a revised birth certificate – is thus critically different in the two states.

### 2. *The Appellees' request for a birth certificate is appropriately brought in state court.*

That the clause affords a rule of decision in state courts is reinforced by the cases that hold reliance on the clause alone insufficient to invoke federal question jurisdiction. 13D CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3563, at 214 (3d ed. 2008); *Minnesota v. N. Sec. Co.*, 194 U.S. 48, 72, 24 S. Ct. 598, 605 (1904) ("[T]o invoke the rule which [the Full Faith and Credit Clause] prescribes does not make a case arising under the Constitution or laws of the United States."); *Anglo-Am. Provision Co. v. Davis Provision Co.*, 191 U.S. 373, 374, 24 S. Ct. 92, 92-93 (1903) (the full faith and credit clause "establishes a rule of evidence rather than of jurisdiction"); *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 291-92, 8 S. Ct. 1370, 1375 (1888). Although the full faith and credit clause is part of the Constitution within the meaning of 28 U.S.C. § 1331, "there is no jurisdiction because the relation of the constitutional provision and the claim is not sufficiently direct that the case 'arises under' the clause." 13D WRIGHT & MILLER § 3563, at 214. Absent an independent source of jurisdiction over such claims, federal district courts may not hear such cases.

No. 09-30036

*See, e.g.*, *Chicago & A.R. Co.*, 108 U.S. at 22, 1 S. Ct. at 615.[7]  Thus, the Fifth Circuit has stated that "a fight over the enforcement of a state court judgment is not automatically entitled to a federal arena." *Hazen Research, Inc. v. Omega Minerals, Inc.*, 497 F.2d 151, 153 n.1 (5th Cir. 1974).

To enforce the clause, Appellees might have sought to compel the issuance of a new birth certificate in Louisiana courts,[8] for full faith and credit doctrine does not contemplate requiring an executive officer to "execute" a foreign judgment without the intermediary of a state court.  *Riley v. N.Y. Trust Co.*, 315 U.S. 343, 349, 62 S. Ct. 608, 612 (1942); *McElmoyle ex rel. Bailey v. Cohen*, 38 U.S. (13 Pet.) 312, 325, 10 L. Ed. 177 (1839) ("[T]he judgment is . . . not examinable upon its merits; but it does not carry with it, into another state, the

---

[7] *See* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 5.2.1, at 275 (5th ed. 2007) ("Jurisdiction for claims under the Constitution of the United States has been held to include all constitutional provisions except the full faith and credit clause of Artice IV, § 1. . . . The full faith and credit clause does not independently justify federal court jurisdiction every time a person seeks to compel a state to respect the judgment of another state's courts."); Lumen N. Mulligan, *A Unified Theory of 28 U.S.C. § 1331 Jurisdiction*, 61 VAND. L. REV. 1667, 1706–07 (2008) (jurisdictional dismissal for failing to assert a colorable constitutional claim is appropriate for cases brought under the full faith and credit clause "because the Clause does not create substantive rights but rather provides a rule of decision (i.e., a procedural rule) for state and federal courts"); Joan M. Krauskopf, *Remedies for Parental Kidnapping in Federal Court: A Comment Applying the Parental Kidnapping Prevention Act in Support of Judge Edwards*, 45 OHIO ST. L.J. 429, 441 n.70 (1984) ("The full faith and credit clause (and presumably statutes enacted to implement it) prescribes a rule by which to determine what faith and credit to give judgments and public acts, and it does not create a basis for federal court jurisdiction.").

[8] For example, Louisiana law provides that "[a] writ of mandamus may be issued in all cases where the law provides no relief by ordinary means." LA. CODE CIV. PROC. ANN. art. 3862.  In particular, "[a] writ of mandamus may be directed to a public officer to compel the performance of a ministerial duty required by law." *Id.* art. 3863; *see also State ex rel. Neighborhood Action Comm. v. Edwards*, 652 So. 2d 698, 699-700 (La. Ct. App. 1995).  Were there no state remedy with respect to a full faith and credit violation, the Supreme Court may remand for a state court to supply one.  *See Broderick v. Rosner*, 294 U.S. 629, 55 S. Ct. 589 (1935).

17

efficacy of a judgment upon property or persons, to be enforced by execution."). The Appellees concede in their brief that "most frequently judgments are enforced through further judicial proceedings, as reflected by the great body of full faith and credit jurisprudence." As the Supreme Court once indicated, to give one state's judgment "the force of a judgment in another state, *it must be made a judgment there*, and can only be executed in the latter as its laws may permit." *Lynde v. Lynde*, 181 U.S. 183, 187, 21 S. Ct. 555, 556 (1901) (emphasis added) (quoting *McElmoyle*, 38 U.S. (13 Pet.) at 325); *Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 462-63, 21 L. Ed. 897 (1873) ("No execution can issue upon such judgments without a new suit in the tribunals of other States.") (quoting J. STORY, CONFLICT OF LAWS § 609 (7th ed. 1872)); *Baker*, 522 U.S. at 241, 118 S. Ct. at 668 (Scalia, J., concurring) (same). After Appellees' case has been submitted to the state courts, the full faith and credit clause may provide the federal question to support Supreme Court review. *See Ford v. Ford*, 371 U.S. 187, 83 S. Ct. 273 (1962) (reviewing South Carolina Supreme Court decision which rested upon its reading of the full faith and credit clause). This course of action coincides with that described by the Supreme Court in *Thompson*.

### 3. *Alternatively, full faith and credit does not extend to enforcing the New York adoption decree.*

Even if we assume, contrary to all the above-cited cases, that § 1983 provides a remedy against non-judicial actors for violations of the full faith and credit clause, the Appellees still cannot prevail because the Registrar has not denied *recognition* to the New York adoption decree.

Supreme Court precedent differentiates the credit owed to laws and the credit owed to judgments. *Baker*, 522 U.S. at 232, 118 S. Ct. at 663. With

18

No. 09-30036

regard to judgments, the Court has described the full faith and credit obligation as "exacting." *Id.* at 233, 118 S. Ct. at 663. The states' duty to "recognize" sister state judgments, however, does not compel states to "adopt the practices of other States regarding the time, manner, and mechanisms for enforcing judgments." *Id.* at 235, 118 S. Ct. at 665. Rather, enforcement of judgments is "subject to the evenhanded control of forum law." *Id.* "Evenhanded" means only that the state executes a sister state judgment in the same way that it would execute judgments in the forum court.

In this case, the Registrar has not refused to recognize the *validity* of the New York adoption decree. The Registrar concedes that the parental relationship of Adar and Smith with Infant J cannot be revisited in its courts. That question is not at issue. The Registrar in fact offered to comply with Louisiana law and reissue a birth certificate showing one of the unmarried adults as the adoptive parent. The Registrar acknowledged that even though she would not issue the requested birth certificate with both names, the Registrar recognizes Appellees as the legal parents of their adopted child. And the Appellees apparently agree, admitting that birth certificates are merely "identity documents that *evidence* . . . the existing parent-child relationships, but do not create them." Appellees affirm that "the child at the center of this case" is already "legally adopted–and nothing that happens in this case will change that." In sum, no right created by the New York adoption order (i.e., right to custody, parental control, etc.) has been frustrated, as nothing in the order entitles Appellees to a particular type of birth certificate.

Appellees nevertheless assert that the full faith and credit clause entitles them to a revised birth certificate with *both* of their names. The Supreme Court

19

has not expressly ruled on this claim, but the Court has never "require[d] the enforcement of every right which has ripened into a judgment of another state or has been conferred by its statutes." *Broderick v. Rosner*, 294 U.S. 629, 642, 55 S. Ct. 589, 592 (1935). Importantly, in *Estin v. Estin*, the Supreme Court held that a divorce decree entered in Nevada effected a change in the couple's marital status in every other state, but the fact "that marital capacity was changed does not mean that every other legal incidence of the marriage was necessarily affected." 334 U.S. 541, 544-45, 68 S. Ct. 1213, 1216 (1948). The Court then enforced a New York alimony decree notwithstanding the Nevada divorce. Forum state law thus determines what incidental property rights flow from a validly recognized judgment. And it has long been recognized that while one state may bind parties with a judicial decree concerning real property in another state, that decree will not suffice to transfer title in the other state. *Fall v. Eastin*, 215 U.S. 1, 30 S. Ct. 3 (1909).

These principles applied in *Hood v. McGehee*, where children adopted in Louisiana brought a quiet title action concerning land in Alabama against their adoptive father's natural children. 237 U.S. 611, 35 S. Ct. 718 (1915). But Alabama's inheritance law excluded children adopted in sister states. *Id.* at 615, 35 S. Ct. at 719. The adopted children argued that the Alabama inheritance statute violated the full faith and credit clause. The Supreme Court disagreed, holding that there was "no failure to give full credit to the adoption of the plaintiffs, in a provision denying them the right to inherit land in another state." *Id.* Justice Holmes wrote that Alabama "does not deny the effective operation of the Louisiana [adoption] proceedings" but only says that "whatever may be the

status of the plaintiffs, whatever their relation to the deceased . . . the law does not devolve his estate upon them." *Id*.

Just as the Court in *Hood* did not find full faith and credit denied by Alabama's refusing certain rights to out-of-state adoptions, so here full faith and credit is not denied by Louisiana's circumscribing the kind of birth certificate available to *unmarried* adoptive parents. "The Full Faith and Credit Clause does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.'" *Sun Oil Co. v. Wortman*, 486 U.S. 717, 722, 108 S. Ct. 2117, 2122 (1988) (quoting *Pac. Emp'rs Ins. Co. v. Indus. Accident Comm'n*, 306 U.S. 493, 501, 59 S. Ct. 629, 632 (1939)). *Hood* recognized that "Alabama is sole mistress of the devolution of Alabama land by descent." *Hood*, 237 U.S. at 615, 35 S. Ct. at 719. Louisiana can be described as the "sole mistress" of revised birth certificates that are part of its vital statistics records. Louisiana has every right to channel and direct the rights created by foreign judgments. *See, e.g.*, *Watkins v. Conway*, 385 U.S. 188, 87 S. Ct. 357 (1966) (holding that Georgia's five-year statute of limitations for suits on out-of-state judgments does not deny full faith and credit). Obtaining a birth certificate falls in the heartland of enforcement, and therefore outside the full faith and credit obligation of recognition.

The Court continues to maintain a stark distinction between recognition and enforcement of judgments under the full faith and credit clause, as *Baker v. General Motors Corp.* confirms. 522 U.S. 222, 118 S. Ct. 657 (1998). The Court held that a Michigan injunction barring a former General Motors employee from testifying against GM could not control proceedings against GM brought in other States. *Id*. at 238, 118 S. Ct. at 666. That the order was "claim

preclusive between [the former employee] and GM" in Michigan did not prevent the employee from testifying if permitted by Missouri courts. *Id.* at 237-38, 118 S. Ct. at 666. According to the Supreme Court, "Michigan has no authority to shield a witness from another jurisdiction's subpoena power in a case involving persons and causes outside Michigan's governance." *Id.* at 240, 118 S. Ct. at 667. This is because "the mechanisms for enforcing a judgment do not travel with the judgment itself for purposes of full faith and credit." *Id.* at 239, 118 S. Ct. at 667.

Similarly, the New York adoption decree cannot compel within Louisiana "an official act within the exclusive province" of that state. *Id.* at 235, 118 S. Ct. at 665. The full faith and credit clause emphatically "did not make the judgments of other States domestic judgments to all intents and purposes." *Whitman*, 85 U.S. (18 Wall.) at 462-63 (quoting J. STORY, CONFLICT OF LAWS § 609 (7th ed. 1872)). Rather, the adoption decree "can only be executed in [Louisiana] as its laws may permit." *Fall*, 215 U.S. at 12, 30 S. Ct. at 8 (quoting *McElmoyle*, 38 U.S. (13 Pet.) at 325).

The Seventh Circuit case of *Rosin v. Monken* is both instructive and current. 599 F.3d 574 (7th Cir. 2010). In *Rosin*, a sex offender entered into a plea bargain in New York under which he would not have to register as a sex offender. *Id.* at 575. The plea bargain was reduced to judgment by a New York state court. When he moved to Illinois, however, he was forced to register as a sex offender. He sued officials in the Illinois state police department under § 1983, claiming they had failed to give full faith and credit to the New York order by requiring him to register as a sex offender. *Id.* The district court denied relief, and the Seventh Circuit affirmed. The court reasoned that even

No. 09-30036

if the New York order had explicitly stated that plaintiff need not register in New York or any other state, Illinois's recognition of the New York order would not oblige the state to enforce that order in the prescribed manner. *Id*. at 576. According to the court, "Illinois need not dispense with its preferred mechanism for protecting its citizenry by virtue merely of a foreign judgment that envisioned less restrictive requirements being imposed on the relevant sex offender." *Id*. at 577. "The Full Faith and Credit Clause was enacted to preclude the same matters' being relitigated in different states as recalcitrant parties evade unfavorable judgments by moving elsewhere. It was never intended to allow one state to dictate the manner in which another state protects its populace." *Id*.

Similarly, the full faith and credit clause does not oblige Louisiana to confer particular benefits on unmarried adoptive parents contrary to its law. Forum state law governs the incidental benefits of a foreign judgment. In this case, Louisiana does not permit any unmarried couples–whether adopting out-of-state or in-state–to obtain revised birth certificates with both parents' names on them. *See* LA. REV. STAT. ANN. § 40:76; LA. CHILD. CODE ANN. arts. 1198, 1221. Since no such right is conferred by either the full faith and credit clause or Louisiana law, the Registrar's refusal to place two names on the certificate can in no way constitute a denial of full faith and credit. As in *Rosin* where Illinois had the right to force the sex offender to register even if the New York judgment provided to the contrary, Louisiana has a right to issue birth certificates in the manner it deems fit. Louisiana is competent to legislate in the area of family

No. 09-30036

relations, and the manner in which it *enforces* out-of-state adoptions does not deny them full faith and credit.[9]

## II.   **EQUAL PROTECTION**

Appellees' alternative § 1983 theory contends that denying a revised birth certificate to children of unmarried couples violates the equal protection clause. Without doubt, Appellees have standing to pursue this claim under § 1983. Appellees do not appear to argue that unmarried couples are a suspect class, or that the Louisiana law discriminates based on sex.  Their theory appears to be that Louisiana treats a subset of children–adoptive children of *unmarried* parents–differently from adoptive children with married parents, and this differential treatment does not serve any legitimate governmental interest.  This theory is unavailing in the face of the state's rational preference for stable adoptive families, and the state's decision to have its birth certificate requirements flow from its domestic adoption law.  To invalidate the latter would cast grave doubt on the former.

Appellees have not explained why adoptive children of unmarried parents is a suspect classification.   While Appellees rely heavily upon the *Levy v. Louisiana*[10] line of cases to support the inference that heightened scrutiny is nonetheless required here, the classification described in those cases relates to

---

[9] Appellees rely on the broad purposes of § 1983 to bolster their claim.  In *Dennis v. Higgins*, 498 U.S. 439, 111 S. Ct. 865 (1991), the Court held that violations of the commerce clause may be redressed by § 1983.  *Dennis*, unlike the instant case, rested on a long line of authorities that conferred an individual "right" of persons engaged in interstate commerce to sue in federal court.  Full faith and credit clause jurisprudence has followed an entirely different enforcement path.  Further, even if § 1983 provided an arguable remedy, the Appellees' *right* to recognition of their out-of-state adoption decree has not been abridged, only the enforcement in terms of a revised birth certificate.

[10] 391 U.S. 68, 88 S. Ct. 1509 (1968).

No. 09-30036

*illegitimacy. See, e.g., Pickett v. Brown*, 462 U.S. 1, 8, 103 S. Ct. 2199, 2204 (1983); *Trimble v. Gordon*, 430 U.S. 762, 767, 97 S. Ct. 1459, 1463 (1977). Since Infant J's birth status is irrelevant to the Registrar's decision, these cases cannot support the conclusion that Infant J belongs to a suspect class protected by heightened scrutiny.[11]   And, since adoption is not a fundamental right,[12] the Louisiana law will be upheld if it is rationally related to a legitimate state interest. *Romer v. Evans*, 517 U.S. 620, 631, 116 S. Ct. 1620, 1627 (1996).

Louisiana has "a legitimate interest in encouraging a stable and nurturing environment for the education and socialization of its adopted children." *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 819 (11th Cir. 2004). Since such an end is legitimate, the only question is the means.  In this case, Louisiana may rationally conclude that having parenthood focused on a married couple or single individual–not on the freely severable relationship of unmarried partners–furthers the interests of adopted children.  In fact, research institution Child Trends released a report underscoring the importance of stable family structures for the well-being of children.[13]   In particular, the report noted that marriage, when compared to cohabitation, "is associated with better outcomes

---

[11]   Importantly, even if the classification at issue were based on illegitimacy, illegitimacy is not a suspect classification and thus not subject to the Supreme Court's most "exacting scrutiny." *Pickett*, 462 U.S. at 8, 103 S. Ct. at 2204; *Trimble*, 430 U.S. at 767, 97 S. Ct. at 1463.

[12] *See, e.g., Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 811 (11th Cir. 2004); *Lindley v. Sullivan*, 889 F.2d 124, 131 (7th Cir. 1989) (concluding "that there is no fundamental right to adopt").  Nor do Appellees attempt to argue that fundamental rights are implicated in this case.

[13]   Kristin Anderson Moore et al., *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It?*, CHILD TRENDS RESEARCH BRIEF, at 6 (2002), *available at* http://www.childtrends.org/files/MarriageRB602.pdf.

No. 09-30036

for children," since marriage is more likely to provide the stability necessary for the healthy development of children.[14]  This fact alone provides a rational basis for Louisiana's adoption regime and corresponding vital statistics registry. Moreover, since the law here attempts neither to encourage marriage nor to discourage behavior deemed immoral (unlike laws invalidated by *Levy*), but rather to ensure stable environments for adopted children, the court has sufficient basis to hold that the Louisiana law does not run afoul of the equal protection clause.  Consequently, Appellees' claim fails on the merits.

## **CONCLUSION**

For the foregoing reasons, the judgment of the district court is reversed and remanded for entry of judgment of dismissal.

---

[14]  *Id.* at 2. The report explains that "cohabiting unions are generally more fragile than marriage."  As a result, such children are more likely to "experience instability in their living arrangements," which "can undermine children's development."  *Id.*

No. 09-30036

REAVLEY, Circuit Judge, concurring:

I concur in the court's opinion by Chief Judge Jones but respond briefly to the disappointing dissent. My dissenting colleagues go beyond our due to fault the Louisiana official for her construction of the Louisiana statute. And then they claim the court here conflicts with the Tenth Circuit's decision[1] where Oklahoma had prohibited its courts and agencies from any recognition of foreign adoptions by same-sex couples. Whatever the correctness of that opinion may be, it is not the case on appeal where the forum state has not refused to recognize the foreign adoption. As the dissent acknowledges, the only contest here is whether plaintiffs may require the Registrar to put both of their names on an amended birth certificate.

But the disturbing theme of the dissent is that the "Full Faith and Credit Clause creates a federal right that is actionable against state actors via 42 U.S.C. § 1983." That ignores all of the authority to the contrary as the majority opinion shows. Remember that the Supreme Court said in *Thompson v. Thompson*, that the "Full Faith and Credit clause, in either its constitutional or statutory incarnations, does not give rise to an implied federal cause of action."[2] The Court supports that statement by citing *Minnesota v. Northern Securities*[3] and Wright and Miller who wrote that it had long been understood that a judgment in another state does not present federal question jurisdiction simply because the plaintiff alleges that full faith and credit must constitutionally be

---

[1] *Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2009).

[2] *Thompson v. Thompson*, 484 U.S. 174, 182; 108 S. Ct. 513, 518 (1988).

[3] *Minnesota v. Northern Securities*, 194 U.S. 48, 72, 24 S. Ct. 598, 605 (1904).

No. 09-30036

given to the judgment.[4]  As Justice Scalia said, concurring in *Baker v. General Motors*, the full faith and credit clause only gives general validity, faith and credit to foreign judgments <u>as evidence</u>.[5]

The dissent would isolate us from controlling precedent of many years.

---

[4] 13D Wright, Miller & Cooper, Federal Practice and Procedure § 3563,

[5] *Baker v. General Motors*, 522 U.S. 222, 241, 118 S. Ct. 657, 668 (1998).

No. 09-30036

LESLIE H. SOUTHWICK, Circuit Judge, specially concurring:

Because of my respect for my colleagues with different views, I open with the observation that we are in untraveled territory. There are divergent understandings being stated by these opinions. The sole purpose of each is to reach the correct destination as charted by the Constitution and the Supreme Court. The charts, though, are not well-marked. It is to be expected that different judges making diligent examinations will discern different courses.

In summary, I conclude that the dissent of Judge Wiener has validly analyzed some of the language in what is perhaps the most relevant decision, *Thompson v. Thompson,* 484 U.S. 174, 178-79 (1988). Yet still I reach the same conclusion as does the majority as to the overall effect of that decision. I would not decide the other issues resolved in the majority opinion, namely, that the Defendant has in fact recognized the foreign adoption or that there is no violation of Equal Protection.

As to the Full Faith and Credit Clause, the majority has quite properly observed that considering Section 1983 to be a remedy for purported violations of this Clause is a new, if not quite brand-new, argument. The validity of the Tenth Circuit's opinion in a related case has been discussed in the other opinions. *See Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007). The Eleventh Circuit has also spoken. *See Stewart v. Lastaiti*, No. 10-12571, 2010 WL 4244064 (11th Cir. 2010) (unpublished). It held Section 1983 was not a vehicle for a claim under the Full Faith and Credit Clause, though its holding was stated softly in an unpublished opinion. *Id.* at *1-2.

The majority relies heavily on *Thompson*. That opinion certainly held "that the Full Faith and Credit Clause, in either its constitutional or statutory

29

incarnations, does not give rise to an implied federal cause of action." *Thompson*, 484 U.S. at 182 (citations omitted). That strong statement does not clearly resolve our issue. By referring to a "cause of action," the Court might have been concluding that strictly based on the specific statute there involved and on the Constitution itself, there was not both a personal right and a remedy for a violation. *See* Larry W. Yackle, Federal Courts 243-44 (3d ed. 2009). The Court did not consider Section 1983. It is not clearly reasonable to conclude that Section 1983 was the unaddressed but ready escape from all the barriers thrown in front of the *Thompson* plaintiff. Still, I am trying to understand what the Supreme Court must be held to have concluded. The most we know from this language in *Thompson* is that neither the specific statute involved nor the Full Faith and Credit Clause itself provided both the right and the remedy.

The dissent may also have the better of it by noting that the Supreme Court has referred to the Full Faith and Credit Clause in terms of "rights." *See* Dissent *infra* at note 19 (Weiner, J., dissenting). That starts us down the road to considering that all that is needed is a vehicle such as Section 1983 by which to enforce the right.

I cannot continue down that road, and therefore part company with the dissent, because of the language in *Thompson* that immediately follows the statement about no implied cause of action. The Court gave a clear and quite limited explanation of the reach of the Full Faith and Credit Clause, namely, that it "'only prescribes a rule by which courts, Federal and state, are to be guided when a question arises in the progress of a pending suit as to the faith and credit to be given by the court to the public acts, records, and judicial proceedings of a State other than that in which the court is sitting.'" *Thompson*,

No. 09-30036

484 U.S. at 182-83 (quoting *Minn. v. N. Sec. Co.*, 194 U.S. 48, 72 (1904); *see* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3563, at 50 (1984)).

Had this 1904 language not been pulled into *Thompson*, I might more readily consider that *Northern Securities* was an anachronism from a day before the rediscovery of Section 1983. Though what is now denominated as Section 1983 was adopted in 1871, it had almost from its inception lay dormant until given life in *Monroe v. Pape*, 365 U.S. 167, 183 (1961), *overruled in part by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 (1978); *See* Michael J. Gerhardt, The Monell Legacy: Balancing Federalism Concerns and Municipal Accountability Under Section 1983, 62 S. Cal. L. Rev. 539,  549 (1989).

Another reason to treat the old construction of Full Faith and Credit as outdated would have been the points Judge Wiener makes in his analysis of why the dormant Commerce Clause was found to create individual rights assertable in a Section 1983 action. *See Dennis v. Higgins*, 498 U.S. 439 (1991). The majority analytically relegates *Dennis* to a footnote, concluding that the jurisprudential treatment of the dormant Commerce Clause and the Full Faith and Credit Clause are distinguishable, the former but not the latter often being written in terms of "rights." *See* Majority Opinion *supra* note 9.

The dissent's good arguments nonetheless fail in light of the adoption of the *Northern Securities* definition of this Clause in *Thompson*. Explaining the 1904 language away as a relic of a different era will not do. This is too recent and clear an explanation of the effect of the Full Faith and Credit Clause to be ignored. Nothing suggests the language was limited to the kind of case the Court was considering, namely, a suit between two private parties. The

31

No. 09-30036

Supreme Court was explaining the work that the Full Faith and Credit Clause could be made to do – in *Thompson* and in all other cases.

Having decided that the Full Faith and Credit Clause does not create an individual right on which a Section 1983 suit may be based, I would not address whether the actions of the Louisiana State Registrar constituted a failure to recognize the New York adoption decree. The issue is not necessary to reach, and I would leave it for a case in which it is relevant.

Finally, as to the Equal Protection argument, the usual practice is not to consider an issue until it has first been addressed by the district court. *See F.D.I.C. v. Laguarta*, 939 F.2d 1231, 1240 (5th Cir. 1991). I would follow that practice here.

No. 09-30036

HAYNES, Circuit Judge, concurring and dissenting:

I concur in the court's judgment reversing and remanding the district court's judgment as to the claim based upon the full faith and credit clause; I further join in the reasoning of Sections I.A and I.B.1 and 2 of the majority opinion. However, I would not reach the alternative ground discussed in Section I.B.3 of that opinion. Without addressing the merits (or lack thereof) of the equal protection argument, I respectfully dissent from the decision to reach that question for the reasons stated in the first paragraph of Section II.B of the dissent.

No. 09-30036

JACQUES L. WIENER, JR., Circuit Judge, with whom FORTUNATO P. BENAVIDES, CARL E. STEWART, JAMES L. DENNIS, and EDWARD C. PRADO, Circuit Judges, join, dissenting:

Convinced that we should affirm the district court by holding that the Full Faith and Credit Clause ("FF&C Clause") creates a *federal* right that is *actionable* against *state actors* via 42 U.S.C. § *1983*, I respectfully dissent.

At the very core of the issue that I take with the en banc majority is my rejection out of hand of the linchpin of their assertion, i.e., that the FF&C Clause imposes obligations solely on state *courts* and not on any other state *actors*. I reject that credo for three main reasons. First, this overly narrow interpretation of the FF&C Clause runs contrary to its plain text, which expressly binds "each State," not just "each State's courts." Second, to support its courts-only position, the en banc majority reads a holding into Supreme Court precedent that simply is not there: To date, the Court has *not addressed* one single FF&C Clause claim brought by a *private* party against a *state* actor under § 1983. Faced with that lacuna, the majority instead relies on cases that predate the states' modern practice of affording out-of-state judgment holders non-judicial procedures to *register* their judgments. Third, the notion that a provision of the Constitution would direct the allocation of the states' internal functions defies basic principles of Federalism.

The FF&C Clause literally imposes a duty on "each State" and thereby creates correlative rights for which § 1983 provides a remedy to private parties against state actors. This conclusion accords with § 1983's broad remedial purpose, which the Supreme Court has repeatedly endorsed and applied expansively. It also comports with the Court's applicable precedent, which squarely holds that a constitutional provision creates a right that is actionable under § 1983 when (1) the provision imposes a mandatory obligation on the

No. 09-30036

several states, (2) the right is concrete, specific, and judicially cognizable, and (3) the provision was intended to benefit the party bringing the action.[1] As I shall do my best to show, all three of these prerequisites are present in the instance of the FF&C Clause.

We should also hold that the Defendant-Appellant Darlene Smith, Louisiana's State Registrar and Director of the Office of Vital Records and Statistics (the "Registrar"), violated the rights guaranteed to Plaintiffs-Appellees Oren Adar and Mickey Smith ("Appellees") by the FF&C Clause when she refused to *recognize* their valid out-of-state adoption decree, which declares them to be "adoptive parents." Only by judicial ledgermain, is the en banc majority able to conclude otherwise: it mislabels *recognition* of an out-of-state judgment, which the FF&C Clause unquestionably requires, as *enforcement* of such a judgment, the methodologies of which no one disputes should be determined by Louisiana law. Stated differently, it is certainly Louisiana's prerogative to determine the benefits to which out-of-state "adoptive parents" are entitled in Louisiana, but the FF&C Clause nevertheless mandates that (1) Louisiana "recognize" all valid out-of-state *status* judgments *and* (2) Louisiana evenhandedly confer to all such judgment-holders those benefits that Louisiana law does establish. Here, Louisiana law declares that *every* "adoptive parent" is entitled to have his or her name reflected on a corrected birth certificate. Yet, the Registrar un-evenhandedly refuses to issue such a certificate to Appellees for the sole reason that she will not "accept," viz., give full faith and credit to, their unquestionably valid out-of-state judgment. What else could this mean but that

---

[1] *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989).

No. 09-30036

she refuses to *recognize* the out-of-state judgment that defines Appellees as "adoptive parents"?

I lament that, in its determination to sweep this high-profile and admittedly controversial case out the federal door (and, presumably, into state court), the en banc majority:

- Strips federal district and appellate courts of subject matter jurisdiction over violations of the FF&C Clause.

- Unduly cabins, if not emasculates, *Ex parte Young* and § 1983 by holding that the federal courts may not enjoin a state's refusal to act in accordance with the mandate of the FF&C Clause.

- Creates a circuit split on the full faith and credit that must be afforded to valid, out-of-state adoption decrees by the adopted child's birth state, as well as the availability of a federal forum for deciding such claims.[2]

- Dismisses *sua sponte* the Appellees' very likely winning claims under the Equal Protection Clause without affording the district court, as the court of "first impression," the initial opportunity to hear the evidence, analyze the case, and adjudicate those claims, as historically required by the prudence and practice of this and other appellate courts.

## I. FACTS & PROCEEDINGS

Inasmuch as the majority opinion does not reiterate the facts of this case or point elsewhere to any recitation of the facts, reference may be made to its

---

[2] *See Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007). *See also Rosin v. Monken*, 599 F.3d 574, 575 (7th Cir. 2010) (permitting a plaintiff to bring a § 1983 action asserting a claim under the FF&C Clause).

## No. 09-30036

factual and procedural posture as detailed in the panel opinion.[3] I here summarize only the key facts that merit emphasis.

Appellees Adar and Smith are the parents and next friends of the third Plaintiff-Appellee, Infant J C A-S ("Infant J"), a five-year-old boy who was born in Shreveport, Louisiana and surrendered there for adoption. Appellees became Infant J's parents by adopting him in a proper New York court in accordance with the laws of that state. That court made the adoption final by issuing a valid order of adoption; neither the Appellant nor the en banc majority questions either the validity or finality of that decree. In those proceedings, Appellees also had Infant J's full name changed from the one that appeared on his original Louisiana birth certificate.

In conformity with the Louisiana "Record of Foreign Adoptions" statute, Appellees conveyed a duly authenticated copy of the New York order of adoption to the Registrar. Because Infant J was born in Louisiana, the Registrar is the sole custodian of his birth certificate.[4] Still following Louisiana's statute, Appellees requested that the Registrar issue Infant J a corrected birth certificate—one that accurately lists them as Infant J's parents and records his true name. Adoptive parents, both in state and out, commonly request an

---

[3] *See Adar v. Smith*, 597 F.3d 697, 701-02 (5th Cir. 2010).

[4] The Registrar remains so even though the family now lives in California and even though the adoption took place in New York. It is beyond me why a state would create the fuss that Louisiana has over this birth certificate when that state has so little, if any, interest in the child or the parents. I note that (1) neither Adar nor Smith was a citizen or resident of Louisiana when they began planning to adopt or when Infant J was born, (2) a final adoption was completed in New York, and (3) neither Adar nor Smith, or Infant J, lives or plans to live in Louisiana. It is not as though this were a so-called "evasion" case: Louisiana's law expressly permits out-of-state adoptions by providing for agency adoption and does not prohibit children from being taken out of state to be adopted by persons whom Louisiana would not allow to adopt in state.

37

updated birth certificate following adoptions,[5] and Louisiana law directs the Registrar to perform this service for out-of-state adoptive parents when presented with a valid out-of-state adoption decree.[6]

In officially rejecting Appellees' request to correct Infant J's birth certificate, the Registrar stated, "We are not able to accept the New York adoption judgment to create a new birth record for J." She did so on the rationale that Louisiana law allows only single individuals and married couples (1) *to adopt* (2) *in Louisiana*, and that this rule should control who may be listed as the parents of an adopted child on his Louisiana birth certificate, irrespective of his state of adoption. This, even though, by its *express* terms, Louisiana *adoption* law governs only who may adopt in a *Louisiana* adoption proceeding; it does not address birth certificates at all. (Ironically, the Registrar eventually offered to settle this case by putting the name of either Adar *or* Smith, but not both, on a revised birth certificate for Infant J, despite the fact that the New York adoption decree lists both Adar *and* Smith as Infant J's lawful parents. I have searched the Constitution in vain for a "Half Faith and Credit Clause.")

Appellees sued the Registrar in district court. Their complaint makes two claims, both under § 1983. The first claim is grounded in the FF&C Clause and asserts that the Registrar's categorical rejection of out-of-state adoption decrees held by unmarried couples violates that Clause. The second claim is grounded in the Equal Protection Clause and has two facets: (1) the Registrar's refusal

---

[5] Adar and Smith are, after all, the only legal parents Infant J has—not even the Registrar now contests that point. Neither does she contest that a birth certificate is a thing of value. It is often required to do things as varied as enroll in school, request a passport, or obtain a marriage license or a driver's license.

[6] *Adar*, 597 F.3d 713-19.

No. 09-30036

violates that Clause by impermissibly classifying Appellees based on their sexual orientation and marital status; and (2) the Registrar's refusal violates that Clause by burdening Infant J with an impermissible legitimacy classification and the state's disapprobation of his parents.

Adar and Smith moved for summary judgment on both claims. The Registrar filed an opposition but did not file any cross-motions for summary judgment. The district court granted Adar and Smith's summary judgment motion based solely on their FF&C Clause claim. Significantly, that court never reached their claims brought under the Equal Protection Clause.

The Registrar appealed, and a panel of this court unanimously affirmed. The Registrar then petitioned for rehearing en banc, which brings us to today.

## II.  ANALYSIS

### A.  The Full Faith and Credit Clause Claim

To begin with, the en banc majority would trivialize Appellees' claim by mischaracterizing it as a quid pro quo: Appellees are *entitled* to a Louisiana birth certificate *because* they obtained a New York adoption decree.[7] But this just is not Appellees' claim. Rather, Appellees assert that the Registrar has acted unconstitutionally by refusing to "accept" their New York adoption decree as an out-of-state "final decree of adoption" as that term is employed in Louisiana's *birth certificate* law (*not* for purposes of its *adoption* laws), which nowhere distinguishes on the basis of the marital status of the adoptive parents. The "recognition" that Appellees request is not the act of "issuing a revised birth

---

[7] *See* En Banc Majority Opinion at 5 ("Infant J was adopted in a court proceeding in New York state, as evidenced by a judicial decree. Appellees contend that [the FF&C Clause] oblige[s] the Registrar to 'recognize' their adoption of Infant J by issuing a revised birth certificate.").

No. 09-30036

certificate," as the en banc majority misleadingly asserts.[8] Instead, Appellees request that the Registrar afford full faith and credit to their valid New York adoption decree by accepting it for purposes of Louisiana's nondiscriminatory birth certificate law—as she does to other *out-of-state* final decrees of adoption.

The en banc majority ultimately misreads (or mislabels) both the text of the FF&C Clause and Supreme Court precedent in its determination to hold that (1) the FF&C Clause is *only* "a rule of decision" for state courts,[9] and, (2) alternatively, the Registrar "has not denied *recognition*" to Appellees' New York adoption decree.[10] When read in proper context, however, both assertions are wholly unsupported by the *substance* of the passages that the majority quotes. I remain convinced that (1) the FF&C Clause *does* create a *federal* right; (2) § 1983 *does* provide the appropriate federal remedy by which such a right may be vindicated against *state* actors—not just state judicial officers but executive and legislative officers as well; and (3) Appellees *have* brought a meritorious § 1983 action against the Registrar for violating their rights under the FF&C Clause.

### 1. The Full Faith and Credit Clause imposes an obligation on "each State" to afford res judicata effect to judgments of other states.

The en banc majority's first misstep is to read words into the FF&C Clause that simply are not there. The FF&C Clause states:

---

[8] *Id.*

[9] *Id.* at 5, 16.

[10] *See id.* at 18 (emphasis in original).

No. 09-30036

> Full Faith and Credit shall be given *in each State* to the public Acts, Records, and *judicial Proceedings* of *every other State*.[11]

Again, the FF&C Clause says "in each State," not "by the Courts of each State." Nowhere in the text of the FF&C Clause does the Constitution say that this Clause *only* "guides rulings in courts" in its "orchestration of inter-*court* comity," as—out of thin air—the en banc majority claims.[12] By its terms, the FF&C Clause addresses itself to the states *qua* states. When the drafters of the Constitution intended for a particular provision to bind only the courts of the states, they knew how to say so, as the text of the Supremacy Clause makes clear.[13] It is a foundational principle of constitutional interpretation that clauses of the Constitution that are worded differently are presumed to carry different meanings.[14] The en banc majority ignores this principle when it assigns the "each State" language of the FF&C Clause the same meaning as the "Judges in every State" language of the Supremacy Clause.[15]

---

[11] U.S. CONST. art. IV, § 1 (emphases added).

[12] En Banc Majority Opinion at 6 (emphasis added).

[13] *See* U.S. CONST. art. § VI, cl. 2 ("This Constitution . . . shall be the supreme Law of the Land; and the *Judges* in every State shall be bound thereby . . . ." (emphasis added)).

[14] *See Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304, 334 (1816) (Story, J.) ("From this difference of phraseology, perhaps, a difference of constitutional intention may, with propriety, be inferred. It is hardly to be presumed that the variation in the language could have been accidental. It must have been the result of some determinate reason . . . ."). *See also McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 414-15 (1819) (Marshall, C.J.) (concluding that "[i]t is impossible, we think, to compare" the Necessary and Proper Clause's use of the word "necessary" with the Import-Export Clause's use of the phrase "*absolutely* necessary . . . without feeling a conviction, that the convention understood itself to change materially the meaning of the word 'necessary,' by prefixing the word 'absolutely'" (emphasis in original)).

[15] Additionally, in the political-question context, it has long been settled that a clause of the Constitution addresses itself to a single branch of government, to the exclusion of all

No. 09-30036

Finding absolutely no support for its position in the text of the FF&C Clause, the en banc majority next turns to case law in search of affirmation that the FF&C Clause binds only state *courts* (and not other state actors). The en banc majority's second misstep, then, is its twisting of Supreme Court precedent—*Thompson v. Thompson*[16] and its progeny—which holds only that there is no *implied* cause of action directly under the FF&C Clause. In no way, however, does this precedent persuade that the FF&C Clause does not create a private federal right that can be asserted via § 1983 against all *state* actors as distinct from *private* actors. The en banc majority errs, therefore, in cherry-picking passages of *Thompson* out of context and applying them here, failing all the while to acknowledge *Thompson*'s naturally limited holding as *a suit between two private parties*, and not, as here, a *private* party against a *state* actor.

On a superficial level, *Thompson* is ambiguous as to whether it holds, on the one hand, that the FF&C Clause, as implemented by the Parental Kidnaping Prevention Act, does not create a federal *right*;[17] or, on the other hand, that Congress did not intend to create a private *remedy* to enforce the rights created by the FF&C Clause.[18] But, if we were to read *Thompson* and its progeny as

others, *only* when the clause evinces a "textually demonstrable commitment" to that branch. *Nixon v. United States*, 506 U.S. 524, 228–29 (1993) (citing *Powell v. McCormack*, 395 U.S. 486, 519 (1969); *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

[16] 484 U.S. 174, 187 (1988).

[17] *See id.* at 183 ("Unlike statutes that explicitly confer a right on a specified class of persons, the PKPA is a mandate directed to state courts to respect the custody decrees of sister States." (citations omitted)).

[18] *See id.* at 179 ("'[T]he legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question.'" (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694 (1979))); *id.* ("In this case, the essential

holding that the FF&C Clause does not create a federal *right*, then *Thompson* cannot be reconciled with the cases in which the Supreme Court has heard appeals from state courts of last resort on FF&C Clause issues.[19] By contrast, if we read *Thompson* as holding only that the FF&C Clause does not create a private *remedy*, then it can coexist without tension alongside the Supreme Court's practice of adjudicating FF&C Clause appeals. For that reason, *Thompson* is properly read as holding only that there is no *private remedy* against *private parties* for violations of the FF&C Clause. That reading is licit because in *Thompson* (as well as in every other case cited by the en banc majority for the proposition that the FF&C Clause only affords a rule of decision

predicate for implication of a private remedy plainly does not exist."); *id.* at 180 ("[T]he context, language, and legislative history of the PKPA all point sharply away from the remedy petitioner urges us to infer."); *id.* at 187 (stating in conclusion that "we 'will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide.'" (quoting *California v. Sierra Club*, 451 U.S. 287, 297 (1981))).

[19] *See, e.g.*, *Manhattan Life Ins. Co. of N.Y. v. Cohen*, 234 U.S. 123, 134 (1914) (conceding that the Supreme Court would have jurisdiction to review a case in which "the record [left] no doubt that rights under the full faith and credit clause were essentially involved and were necessarily passed upon"); *Rogers v. Alabama*, 192 U.S. 226, 230-31 (1904) ("[T]he exercise of jurisdiction by this court to protect constitutional rights cannot be declined when it is plain that the fair result of a decision is to deny the rights. . . . [T]here can be no doubt that if full faith and credit were denied to a judgment rendered in another state upon a suggestion of want of jurisdiction, without evidence to warrant the finding, this court would enforce the constitutional requirement." (citation omitted)); *German Sav. & Loan Soc'y v. Dormitzer*, 192 U.S. 125, 126-27 (1904) (explaining that in a case addressing whether "full faith and credit [had] been given to a decree of divorce," the state supreme court's opinion "deal[t] expressly with the constitutional rights of the [private party], and the [private party] seems to have insisted on those rights as soon as the divorce was attacked"); *Hancock Nat'l Bank v. Farnum*, 176 U.S. 640, 641-45 (1900) (reversing a decision of the Rhode Island Supreme Court on the ground that it denied the plaintiff "a right given by § 1, article 4, of the Constitution of the United States"); *Estin v. Estin*, 334 U.S. 541, 550 (1948) (Frankfurter, J., dissenting) (noting the existence of "a federal right, given by the Full Faith and Credit Clause").

No. 09-30036

in state courts[20]), *the defendant was a private citizen*, not a state official![21] This
is the reason—the *only* reason—why the default federal remedies that are
available in actions *against state officials*, i.e., the doctrine of *Ex Parte Young*
and 42 U.S.C. § 1983, were not available against the *private* actors in *Thompson*
and its progeny.

Properly understood then, *Thompson* does not control the instant case. The
reason there was no remedy to enforce the FF&C Clause in *Thompson* is that
there is no implied cause of action for violations of the FF&C Clause by private
parties. Here, however, when Appellees are suing a *state actor*, they have no
need for an *implied* cause of action: Section 1983 *expressly* provides them with
the only remedy they seek and the only one they need. At bottom, the *Thompson*
holding has no bearing on either of the questions that are dispositive of this
appeal, to wit: (1) May a state delegate to a non-judicial actor the obligation of
giving full faith and credit to out-of-state judgments? and (2) if it may and does
so, what remedies are available to a judgment holder if that non-judicial state
actor fails or refuses to carry out that constitutional obligation?

It is true that FF&C Clause claims have traditionally arisen in state-court
litigation, but only because bringing suit on an out-of-state judgment was
historically the only method of enforcing an out-of-state judgment[22] (and

---

[20] *See* En Banc Majority Opinion at 16.

[21] *See, e.g.*, *Thompson*, 484 U.S. at 178 (suit by an ex-husband against an ex-wife);
*Minnesota v. N. Securities Co.*, 194 U.S. 48, 71-72 (1904) (suit by a state against a foreign
corporation); *Anglo-Am. Provision Co. v. Davis Provision Co.*, 191 U.S. 373, 374 (1903) (suit
by one corporation against another corporation); *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265,
286 (1888) (suit by a state against a foreign corporation).

[22] *See Guinness PLC v. Ward*, 955 F.2d 875, 890 (4th Cir. 1992) ("[U]nder the common
law, the procedure to enforce the judgment of one jurisdiction in another required the filing

44

No. 09-30036

therefore only state judges were in a position to deny recognition to a judgment, i.e., violate the FF&C Clause). An accident of history is not a constitutional necessity, however. In fact, to date, all but two or three of the fifty states have enacted some version of the Revised Uniform Enforcement of Foreign Judgments Act, which authorizes non-judicial officers to register out-of-state judgments, thereby entrusting to them their states' obligations under the FF&C Clause.[23] For example, the Louisiana Constitution mandates that "[i]n each parish a clerk of the district court . . . *shall be ex officio notary public and parish recorder of conveyances, mortgages, and other acts . . . .*"[24] Thus, a parish clerk of court—a non-judicial administrative official—routinely records out-of-state money judgments in Louisiana's public records just as he records deeds, mortgages, etc.—parallel to the Registrar's nondiscretionary duties with regard to out-of-state status decrees—and he does so, or fails to do so, wearing his public-records hat and not his court-functionary hat, without any intervention by a state court of law and without a state judge's application of the FF&C Clause's alleged "rule of decision." In this way, the en banc majority's insistence that the states must

---

of a new suit in the second jurisdiction to enforce the judgment of the first. The suit on the judgment was an independent action." (citation omitted)). *See also Milwaukee Cnty. v. M.E. White Co.*, 296 U.S. 268, 271 (1935) (explaining that "suits upon a judgment, foreign or domestic, for a civil liability, . . . were maintainable at common law upon writ of debt, or of indebitatus assumpsit.").

[23] The Act, promulgated in 1964 by the National Conference of Commissioners on Uniform State Laws, allows an out-of-state judgment holder to file an authenticated copy of an out-of-state judgment with the clerk of an in-state court and provides that "[a] judgment so filed has the same effect . . . as a judgment of a [court] of [the forum] state and may be enforced or satisfied in a like manner." REVISED UNIFORM ENFORCEMENT OF FOREIGN JUDGMENTS ACT § 2 (1964).

[24] LA. CONST. art. V, § 28 (emphasis added).

use only their *courts* to satisfy their duties under the FF&C Clause is not only unsupported by Supreme Court precedent; it also draws into question the constitutionality of the judgment-registration statutes of those states and even the Louisiana Constitution.

Lastly, the en banc majority fails to address the fact that its construction of the FF&C Clause—that it applies only to state courts and thus only state courts must recognize out-of-state judgments—is inconsistent with the Constitution's system of dual sovereignty. The framers of the Constitution expressly refrained from dictating to the states how to organize themselves internally. It is "[t]hrough the structure of its government" that "a State defines itself as a sovereign."[25] This is why there is no provision anywhere in the Constitution that removes from the states the discretion to discharge the obligations that the Constitution imposes on them however they see fit.[26] This constitutionally mandated solicitude toward the states' prerogative to arrange their own affairs is the reason that we have the clear-statement rule of statutory construction.[27] By declaring that the FF&C Clause requires the states to use only their courts, and not also their non-judicial officials, to fulfill their full-faith-

---

[25] *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

[26] The closest the Constitution comes is in the Republican Form of Government Clause, *see* U.S. CONST. art. IV, § 4, and it has long been the law that the question of what that clause requires is a political one for Congress, not a judicial one for the courts. *See generally Luther v. Borden*, 48 U.S. (7 How.) 1 (1849).

[27] *See Gregory*, 501 U.S. at 460 ("If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." (citations, internal quotation marks, and alterations omitted)).

No. 09-30036

and-credit obligations, the en banc majority erodes the dual federal/state sovereignty that has long been the hallmark of American Federalism.

### 2. The Appellees' request for a corrected birth certificate was appropriately made to the Registrar, and their complaint against the Registrar for her unconstitutional refusal to recognize their parental status was appropriately brought in federal court via § 1983.

The en banc majority fails to appreciate or acknowledge the role—indeed, the raison d'etre—of § 1983 in providing a private remedy against state actors. This failure is exemplified in the majority's persistent reliance on the Supreme Court's pronouncements regarding the FF&C Clause *outside of* the § 1983 context. The majority asserts that "the Court has expressly indicated that the only remedy available for violations of full faith and credit is review by the Supreme Court."[28] Yet again, in a precedential non sequitur, the majority relies exclusively on *Thompson v. Thompson* for this proposition.

Exacerbating its misapplication of this Supreme Court precedent is the majority's failure to heed the Court's direction to apply § 1983 expansively. The Supreme Court has repeatedly pronounced that § 1983 is a remedial statute which is intended "to be broadly construed, against all forms of official violation of federally protected rights."[29] With this maxim firmly entrenched, the Court has willfully extended the aegis of § 1983 enforcement to non–Fourteenth Amendment rights, such as, for example, those guaranteed by the dormant Commerce Clause.

---

[28] En Banc Majority Opinion at 13 (citing *Thompson*, 484 U.S. 174).

[29] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 700-01 (1978). *See also Golden State*, 493 U.S. at 105-06 ("We have repeatedly held that the coverage of [§ 1983] must be broadly construed." (citations omitted)).

No. 09-30036

It is well settled indeed that, even though "[a] vast number of § 1983 actions involve violation of constitutional rights in individual circumstances,"[30] actions brought via § 1983 may assert violations of non-individual constitutional rights. *Dennis v. Higgins*[31] is a prime example. There, a motor carrier filed a § 1983 cause of action against Nebraska state officials for violating the Commerce Clause by imposing "retaliatory" taxes and fees on motor carriers that operated in Nebraska but used vehicles registered in other states.[32] The Nebraska Supreme Court had ruled that "claims under the Commerce Clause are not cognizable under § 1983 because, among other things, the Commerce Clause does not establish individual rights against government, but instead allocates power between the state and federal governments."[33] The Supreme Court nevertheless directed that "[a] broad construction of § 1983 is compelled by the statutory language . . . . The legislative history of the section also stresses that as a remedial statute, it should be liberally and beneficently construed."[34] "Even more relevant to [that] case," the Court noted, it had consistently "rejected

---

[30] 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, RICHARD D. FREER, JOAN E. STEINMAN, CATHERINE T. STRUVE, VIKRAM DAVID AMAR, FEDERAL PRACTICE AND PROCEDURE § 3531.6 (3d ed. 2010).

[31] 498 U.S. 439 (1991).

[32] *See id.* at 441 ("In his complaint, petitioner complained, *inter alia*, that the taxes and fees constituted an unlawful burden on interstate commerce and that respondents were liable under 42 U.S.C. § 1983.").

[33] *Id.* at 442 (internal quotation marks omitted).

[34] *Id.* at 443 (internal footnote and quotation marks omitted).

attempts to limit the types of constitutional rights that are encompassed within the phrase 'rights, privileges, or immunities.'"[35]

In *Dennis*, the Court reviewed the two-step inquiry that it had laid out in *Golden State Transit Corporation v. Los Angeles* for determining whether § 1983 provides a remedy for violations of a particular provision of federal law: first, requiring the plaintiff to "assert the violation of a federal right" and second, requiring the defendant to "show Congress specifically foreclosed a remedy under § 1983."[36] The Court had identified three factors that initially help determine whether a statutory or constitutional provision creates a federal right: whether the provision (1) "creates obligations binding on the governmental unit," (2) that are sufficiently specific and concrete to be judicially enforced, and (3) were "intended to benefit the putative plaintiff."[37] The *Dennis* Court concluded that the Commerce Clause did indeed create a federal right:

> Although the language of [the Commerce Clause] speaks only of Congress' power over commerce, the Court long has recognized that it also *limits the power of the States* to erect barriers against interstate trade. Respondents argue, as the court below held, that the Commerce Clause merely allocates power between the Federal and State Governments and does not confer "rights." There is no doubt that the Commerce Clause is a power-allocating provision, giving Congress pre-emptive authority over the regulation of interstate commerce. It is also clear, however, that the Commerce Clause does more than confer power on the Federal Government; it

[35] *Id.* at 445.

[36] 493 U.S. at 106 (quotation marks and citations omitted). Because the Registrar has *not* shown, or even argued, that there is a comprehensive enforcement scheme for preventing state interference with the right created by the FF&C Clause that would foreclose the § 1983 remedy, the only issue is whether the FF&C Clause creates a federal right. *See id.* at 108-09.

[37] *Id.* (quotation marks, alterations, and citations omitted).

is also a *substantive restriction on permissible state regulation* of interstate commerce. The Commerce Clause has long been recognized as *a self-executing limitation on the power of the States* to enact laws imposing substantial burdens on such commerce.[38]

The *Dennis* defendants had conceded that the first two *Golden State* factors favored the plaintiffs but argued that "the Commerce Clause does not confer rights within the meaning of § 1983 because it was not designed to benefit individuals, but rather was designed to promote national economic and political union."[39] The Court disagreed, explaining that the individual plaintiffs were "within the 'zone of interests' protected by the Commerce Clause."[40] Additionally, the regulation of the states in this instance was *for the plaintiffs' benefit*.[41]

In like manner, the FF&C Clause expressly limits the power of states to deny full faith and credit to the judgments of other states. All three of the *Golden State* factors favor the conclusion that the FF&C Clause creates a right that is actionable under § 1983: the FF&C Clause unambiguously imposes a mandatory, binding obligation on the several *states* and thus on their actors;[42] the right to have an out-of-state judgment recognized is concrete, specific, and

---

[38] 498 U.S. at 446-47 (internal quotation marks and citations omitted and emphases added).

[39] *Id.* at 449.

[40] *Id.*

[41] *See id.*

[42] *See, e.g.*, *Estin*, 334 U.S. at 545-46 ("The Full Faith and Credit Clause . . . substituted a command for the earlier principles of comity . . . and ordered submission by one State even to hostile policies reflected in the judgment of another State . . . .").

judicially cognizable;[43] and the FF&C Clause was intended to benefit individual holders of out-of-state judgments.[44]

Justice Kennedy, in his *Dennis* dissent, disagreed with the majority because he saw a "distin[ction] between those constitutional provisions which secure the rights of persons vis-à-vis the States, and those provisions which allocate power between the Federal and State Governments."[45] He concluded that "[t]he former secure rights within the meaning of § 1983, but the latter do not."[46] Thus, Justice Kennedy distinguished all "supposed right[s]" secured by Article I of the Constitution as falling outside the scope of § 1983, which was consistent with the Court's previous holding in *Carter v. Greenhow*,[47] prohibiting

---

[43] *See, e.g.*, *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 693-94 (1982).

[44] *See Thomas v. Wa. Gas Light Co.*, 448 U.S. 261, 278 n.23 (1980) ("[T]he purpose of [the FF&C Clause] was to preserve rights acquired or confirmed under the public acts and judicial proceedings of one state by requiring recognition of their validity in other states . . . ." (quoting *Pac. Emp'rs Ins. Co. v. v. Indus. Accident Comm'n of Cal.*, 306 U.S. 493, 501 (1939))); *Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 439 (1943) (explaining that the "clear purpose of the full faith and credit clause" was to ensure that "rights judicially established in any part [of the nation] are given nation-wide application"). It is axiomatic that a judgment establishes rights that benefit the judgment holder. *See, e.g.*, *Hanson v. Denckla*, 357 U.S. 235, 246 n.12 (1958).

[45] *Dennis*, 498 U.S. at 452-53 (Kennedy, J., dissenting). *See also Golden Transit*, 493 U.S. at 116 (Kennedy, J., dissenting) ("[Section 1983] thus distinguishes secured, rights, privileges, and immunities from those interests merely resulting from the allocation of power between the State and Federal Governments.").

[46] *Dennis*, 498 U.S. at 453 (Kennedy, J., dissenting).

[47] 114 U.S. 317 (1885).

No. 09-30036

a § 1983 action for a Contracts Clause claim.[48] In *Carter*, the Court had explained:

> [The Contracts Clause] forbids the passage by the states of laws such as are described. If any such are nevertheless passed by the legislature of a state, they are unconstitutional, null, and void. In any judicial proceeding necessary to vindicate his rights under a contract affected by such legislation, the individual has a right to have a judicial determination declaring the nullity of the attempt to impair its obligation. This is the only right secured to him by that clause of the constitution.[49]

Justice Kennedy insisted that this construction of the Contracts Clause applied equally, if not more so, to the Commerce Clause:

> At least such language [of the Contracts Clause] would provide some support for an argument that the Contracts Clause prohibits States from doing what is inconsistent with civil liberty. If the Contracts Clause, an express limitation upon States' ability to impair the contractual rights of citizens, does not secure rights within the meaning of § 1983, it assuredly demands a great leap for the majority to conclude that the Commerce Clause secures the rights of persons.[50]

When applied, not to the Commerce Clause, but to the FF&C Clause, both Justice Kennedy's concerns and the Court's earlier holding in *Carter* are easily reconcilable with the *Dennis* majority's holding. For openers, the FF&C Clause—an Article IV provision outlining the states' obligations, not an Article I power-allocating provision—plainly does secure the rights of persons, i.e., individual judgment-holders, against the several states. Just as plainly, the

---

[48] *See Dennis*, 498 U.S. at 457-58 (Kennedy, J., dissenting).

[49] 114 U.S. at 322.

[50] *Dennis*, 498 U.S. at 458 (Kennedy, J., dissenting).

No. 09-30036

FF&C Clause does not deal with the allocation of power between the state and federal governments. Thus, Justice Kennedy's exception of provisions that allocate power does not encompass the FF&C Clause, which affirms the finality of judgments obtained by individuals in one state vis-à-vis *every other state*. Moreover, whereas the Contracts Clause is a restriction on a state's authority to pass laws that *collaterally* impede citizens' ability to contract, the FF&C Clause is a restriction on state action that *directly* undermines any individual's state judgment.

Unlike the Commerce Clause then, the FF&C Clause does embody the right of an individual against a state, not the right of the states against the federal government. And, unlike the Contracts Clause, the FF&C Clause has a direct effect on individual citizens, i.e., as a result of its general restriction on state legislation, does more than collaterally affect individuals. Finally, as alluded to by Justice Kennedy, the FF&C Clause—even more so than the Commerce Clause *or* the Contracts Clause—prohibits states from doing that which is "inconsistent with civil liberty"[51]—here, the Registrar's refusal to recognize the New York decree's establishment of Appellees' rightful status as the legal parents of Infant J.

For all the same reasons advanced by the *Dennis* Court in recognizing the private federal right created by the Commerce Clause—including the issues raised by Justice Kennedy in his dissent—the FF&C Clause indisputably does confer a constitutional "right" for which § 1983 provides an appropriate remedy. Respectfully, the en banc majority errs absolutely in concluding otherwise.

---

[51] *Id.*

53

No. 09-30036

### 3.   The Full Faith and Credit Clause does not extend to enforcing the New York adoption decree under New York's enforcement regime but does extend to accepting the out-of-state decree as a valid decree under Louisiana's enforcement regime

The Supreme Court has defined the right secured by the FF&C Clause as one of "recognition"—not "enforcement"—making three distinct pronouncements: (1) "[a] final judgment in one State . . . qualifies for *recognition* throughout the land" and thereby "gains nationwide force";[52] (2) although "[e]nforcement measures do not travel with the sister state judgment as preclusive effects do[,] such measures remain subject to the *even-handed* control of forum law";[53] and (3) although "[a] court may be guided by the forum State's 'public policy' in determining the law applicable to a controversy," there is "*no roving 'public policy exception'* to the full faith and credit due judgments."[54]

For the instant case, this means: (1) Louisiana must *recognize* the New York adoption decree, i.e., Louisiana must accept Appellees' legal "adoptive parent" status that was lawfully established by the New York decree; (2) Louisiana is not required to apply New York's birth certificate law or afford Appellees any rights granted to "adoptive parents" by *New York* law, but

---

[52] *Baker*, 522 U.S. at 233 (citations omitted and emphasis added).

[53]  *Id.* at 235 (citation omitted and emphasis added).

[54] *Id.* (citations omitted and emphasis added). Interestingly enough, the Registrar formally rejected Appellees' application for a revised birth certificate based on an advisory opinion from the Louisiana Attorney General that *incorrectly* concluded: "*Louisiana is not required to accept such an out-of-state judgment under the Full Faith and Credit Clause of the United States Constitution if it violates public policy.*" Finding no supporting legal authority for that statement, I can only conclude that the Attorney General pulled it out of political thin air.

54

No. 09-30036

Louisiana *must* maintain "evenhanded control" of its *own* birth certificate law; and (3) Louisiana may look to its public policy to determine whether its Vital Statistics Laws apply to this controversy, but it may not refuse to give the New York adoption decree *full* faith and credit because of policy concerns (especially not those articulated by its *adoption* laws, which are wholly irrelevant to this New York adoption *and* to Louisiana's birth certificate law).

The en banc majority skims over these nuances of the Supreme Court's application of the FF&C Clause. Even worse, it mistakenly converts the notion of "recognition" into one of "enforcement," so as to conclude that "[o]btaining a birth certificate falls in the heartland of enforcement, and therefore outside the full faith and credit obligation of recognition."[55] But, the Supreme Court has only excluded from FF&C Clause protection the enforcement of the *rendering* state's laws—which are not at issue here. What it has maintained, however, is that the forum state does have an obligation to apply its own enforcement measures evenhandedly to all out-of-state judgments. If a forum state refuses to apply its enforcement measures to only *some* out-of-state judgments, i.e., does not maintain evenhanded control of forum law, it is essentially refusing to *recognize* the force of those disfavored out-of-state judgments *in* the forum state. And that is precisely what the Registrar has done here. She has refused to recognize Appellees' nationwide, lawful status as "adoptive parents" by denying them the "adoptive parent" rights created in *Louisiana's* birth certificate (not adoption) statute.

Thus, much like the arguments made by Oklahoma in *Finstuen v. Crutcher*, the en banc majority's conclusion "improperly conflates [Louisiana]'s

---

[55] En Banc Majority Opinion at 21.

## No. 09-30036

obligation to give full faith and credit to a sister state's judgment with its authority to apply *its own state laws* in deciding what state-specific rights and responsibilities flow from that judgment."[56] Louisiana's birth certificate statute is surely one that decides which Louisiana-specific rights flow from an out-of-state adoption decree: *No one* challenges either that statute or Louisiana's prerogative to determine whether "adoptive parents" are entitled to a revised birth certificate. Yet the Registrar has *still* failed to meet her obligation to afford full faith and credit to Appellees' out-of-state adoption decree by refusing to recognize it and to issue revised birth certificates to "adoptive parents" evenhandedly.

The en banc majority's reliance on the Supreme Court century-old case of *Hood v. McGehee*[57] aptly illustrates its error in confusing "recognition" with "enforcement." In *Hood*, a man who had adopted children in Louisiana subsequently bought land in Alabama. When he died, his adopted children brought a quiet-title action, asserting their rights to the Alabama land. Under Louisiana law, the adopted children would have had inheritance rights to the land because the Louisiana adoption decree vested the adopted children with the same inheritance rights as those of biological children. But, under Alabama inheritance law at that time, *no* children adopted in other states could inherit land in Alabama from their adoptive parents. The Supreme Court ultimately held that the Alabama inheritance law did not violate the FF&C Clause.[58]

---

[56] 496 F.3d at 1153 (emphasis added).

[57] 237 U.S. 611 (1915).

[58] *See id.* at 615.

No. 09-30036

That said, the only proper *Hood* analogy to the instant case would be if New York law *would* allow all adoptive parents to obtain revised birth certificates but Louisiana law would *not*. In this hypothetical example, Appellees would not be entitled to a revised Louisiana birth certificate simply because of the New York law; neither would they be entitled to claim that the Louisiana law violated the FF&C Clause.

But, that is far removed from the case that is before us today. Here, the Registrar is not refusing to apply New York's birth certificate law; she is refusing to "accept" the New York adoption decree and recognize the corresponding status determination for purposes of *Louisiana*'s birth certificate law. The problem here is *not* that Louisiana, like Alabama in *Hood*, is "refusing certain rights to out-of-state adoptions," as the en banc majority asserts.[59] The real problem is that Louisiana is refusing rights *created by its own law*, but *only* to a subset of valid out-of-state adoptions. In favoring some out-of-state adoptions over others, the Registrar is refusing to give full faith and credit to all of them, i.e., she is not enforcing Louisiana law in an *evenhanded manner,* which she is constitutionally required to do. The Registrar's actions are thus patently distinguishable from those of Alabama in *Hood*, and—for the same reasons that Alabama's law did *not* violate the FF&C Clause—the Registrar's actions ineluctably do.

The en banc majority also improvidently relies on *Rosin v. Monken*, a Seventh Circuit case that the majority mislabels "instructive."[60] *Rosin* does not support the majority's position, however. To the contrary, it exemplifies exactly

---

[59] En Banc Majority Opinion at 20-21.

[60] *Id.* at 22.

how the FF&C Clause functions to give nationwide recognition to one state's status determination. In *Rosin*, the plaintiff was convicted as a sex offender in New York, thereby lawfully obtaining "sex offender" status; but he was not required to register in New York's sex offender registry because his plea agreement specified that the New York registration requirement be deleted from his plea form. When the defendant moved to Illinois, however, that state did require him, as a person with "sex offender" status, to record his status in Illinois's sex offender registry.[61] The Seventh Circuit held that the absence of a registration requirement in the New York plea deal need not be given full faith and credit in Illinois because "[the defendant] could not bargain for a promise from New York as to what other states would do based on his guilty plea to sexual abuse in the third degree."[62] Nevertheless, the defendant's New York "guilty plea to sexual abuse" did universally define him as a "sex offender," which was a legal status that *did* transfer into Illinois pursuant to the FF&C Clause for purposes of Illinois's "enforcement" laws that dictate the obligations of "sex offenders" living in Illinois.[63]

Likewise here, when Adar and Smith legally adopted Louisiana-born Infant J in New York, each gained the status of "adoptive parent" for purposes of the laws of every other state, including Louisiana. Consequently, when Appellees, as the lawful "adoptive parents" of Infant J, duly requested a birth

---

[61] *See Rosin*, 599 F.3d at 575.

[62] *Id.* at 577.

[63] Interestingly enough, in this "instructive" case, the plaintiff brought a FF&C Clause claim—*under § 1983*—against the Illinois officials whom he alleged had failed to recognize the New York plea deal by forcing him to register in Illinois. And, federal jurisdiction thus obtained was never questioned. *See id.* at 575.

No. 09-30036

certificate pursuant to the cognizant Louisiana statute, the Registrar violated the FF&C Clause by refusing to accept their request. This despite the fact that—under that specific Louisiana statute—*all* "adoptive parents" are entitled to have their names registered on their Louisiana-born child's birth certificate. By refusing to treat *both* Adar *and* Smith as lawful "adoptive parents" under Louisiana's birth certificate law, the Registrar failed to *recognize* Appellees' status as defined by the New York judgment.

The only difference between *Rosin* and the instant case lies in the fact that the Illinois officials *wanted* to accept the New York "sex offender" status of the defendant and record it in accordance with Illinois law; but, for *public policy reasons,* the Louisiana Registrar does *not* want to accept the New York "adoptive parent" status of both Appellees and to record it in compliance with Louisiana law. That small *difference* does not, however, *legally distinguish* these two cases, especially given that there is no roving public policy exception to the full faith and credit that is owed to out-of-state judgments. The legal issue is the same in each case: Both involve the forum state's recognition of *another state's status determination*, which the Supreme Court has long identified as a type of judgment that is entitled to full faith and credit.[64]

Neither the Appellees nor I have ever claimed that, alone and in a vacuum, the FF&C Clause gives them the right to have their names appear on Infant J's birth certificate. But, Louisiana has elected to enact a "Record of Foreign

---

[64] *See, e.g.*, *Williams v. North Carolina*, 325 U.S. 226, 230 (1945) ("Since divorce, like marriage, creates a new status, every consideration of policy makes it desirable that the effect should be the same wherever the question arises."); *Williams v. North Carolina*, 317 U.S. 287, 301 (1942) (rejecting the contention that "decrees affecting the marital status of its domiciliaries are not entitled to full faith and credit in sister states").

No. 09-30036

Adoptions" statute that specifically addresses recording the status of *out-of-state adoptive parents of Louisiana-born children*. Louisiana's statute states:

> When a person [1] born in Louisiana [2] is adopted in a court of proper jurisdiction [3] in any other state or territory of the United States, the [Louisiana] state registrar may create a new record of birth in the archives [4] upon presentation of a properly certified copy of the final decree of adoption . . . . *Upon receipt of the certified copy of the decree, the state registrar* **shall** *make a new record in its archives*, showing: . . . The name*s* of the adoptive parent*s* and any other data about them that is available and adds to the completeness of the certificate of the adopted child.[65]

This specialized statute unequivocally directs[66] the Registrar to record *all* validly certified out-of-state adoption decrees by, *inter alia*, inscribing the names of *all* "adoptive parents" on revised birth certificates. And the FF&C Clause unquestionably requires the Registrar to recognize *all* out-of-state adoptions. And this is precisely what she has refused to do. When carefully and objectively examined, the Registrar's actual policy is to issue new birth certificates containing the names of every adoptive parent for *some* out-of-state adoptions but *not* for others—specifically, not for adoptions by two unmarried parents like Appellees. As such, the Registrar's pick-and-choose recognition policy violates the FF&C Clause.

---

[65] LA. REV. STAT. ANN. § 40:76 (emphases added).

[66] The Registrar has argued, and the en banc majority has agreed, that § 40:76(A)'s initial use of permissive language stating that she "may create a new record" means that she enjoys absolute discretion in issuing or denying birth certificates for out-of-state adoptions. The panel opinion rejected this argument as unpersuasive and unreasonable in light of Louisiana law and held that the correct interpretation of § 40:76(A) is that its use of "may" affords the Registrar the limited discretion of determining whether the certification furnished by the applicants is satisfactory. For a more extended discussion on why the Registrar and the en banc majority is mistaken, *see Adar*, 597 F.3d at 715-18.

No. 09-30036

The en banc majority is simply off target in characterizing the Registrar's action as "declin[ing] [ ] to *enforce* the New York decree by altering Infant J's birth records in a way that is inconsistent with Louisiana law governing reissuance."[67] I repeat, Louisiana is declining to *recognize* the New York decree for purposes of its *own* law! Louisiana law commands that the names of every—repeat, *every*—out-of-state adoptive parent "shall" appear on the adopted child's reissued Louisiana birth certificate. The sole prerequisite is the presentation to the Registrar of a certified copy of the out-of-state adoption decree. In no way, then, would reissuing a revised birth certificate to Appellees be "*inconsistent*" with this law. On the contrary, it would be entirely consistent with it.[68]

I must also disagree with the en banc majority's contention that the Registrar's offer to reissue the birth certificate, but only with the name of either Adar *or* Smith, both "compl[ies] with Louisiana law" and "recognizes Appellees as the legal parents of their adopted child."[69] These assertions are puzzling to say the least: They patently ignore the constitutional truism that the Appellees' adoption decree is entitled to *full* faith and credit, not to *half* faith and credit—not to mention the fact that the "Louisiana law" *at issue*, as explained above, is *nondiscriminatory* and *nondiscretionary* on its face. If anything, the en

---

[67] En Banc Majority Opinion at 5 (emphasis added).

[68] Reissuing a revised birth certificate to Appellees would also be consistent with the wholly separate Louisiana statute for *in-state* adoptions of Louisiana-born children. Although Louisiana law places restrictions on who may *adopt* in Louisiana in the first place, once a child is legally adopted there, Louisiana commands that the name of every legal adoptive parent "*shall* be recorded" on the child's birth certificate. *See* LA. REV. STAT. ANN. § 40:79(A)(2) (emphasis added).

[69] En Banc Majority Opinion at 19.

banc majority's ascribing "recognition" to the Registrar's Solomonesque offer to Infant J's adoptive parents to decide between themselves which one she should list on the certificate judicially blesses a quintessential Catch-22 choice. It further underscores the Registrar's un-evenhandedness in refusing to give official recognition to both parents' legal status and in refusing to accept both of them as the legal adoptive parents of Infant J for purposes of Louisiana's own birth certificate (not adoption) law.[70] This flies in the face of that unambiguous statute which explicitly governs out-of-state adoptions of Louisiana-born children and just as explicitly mandates the listing of every adoptive parents on presentation of the proper documentation. And it does so without any restriction, reservation, or discretionary exception whatsoever.

Importantly, Appellees are *not* asking Louisiana to change its law; neither are they requesting an order commanding the Registrar to apply Louisiana law to them.[71] Appellees challenge only the constitutionality of the Registrar's policy

---

[70] Furthermore, although not raised by Appellees, if the Registrar were to issue a birth certificate with the name of only one parent on it, she would violate the other parent's Due Process rights by unlawfully terminating his interest in parental rights. *See In re Adoption of B.G.S.*, 556 So. 2d 545, 548-50 (La. 1990) (explaining that the ability of a mother of an illegitimate child to refuse to place the father's name of the birth certificate amounts to "the power to deprive the unwed father of his natural parental right to custody").

[71] Appellees presumably could have brought a mandamus action in *state* court for an order commanding the Registrar to issue a revised birth certificate under Louisiana law (an action that, under *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984), no federal court could entertain). But Appellees never took that course of action. Instead, they brought their action against the Registrar in *federal* court, via § 1983, to redress her violation of the FF&C Clause, i.e., her refusal to recognize another state's judgment. Because we are constrained in every instance to address the case actually brought, not one that theoretically could have been brought, we have no choice but to analyze Appellees' federally asserted claim under federal law if legally possible. Accordingly, unlike the question presented in *Pennhurst*, the question we must answer under the FF&C Clause is whether the Registrar has afforded Appellees' valid New York adoption decree the *recognition* to which a judgment of another

## No. 09-30036

of refusing to "accept" those out-of-state adoption decrees that declare an unmarried couple to be a Louisiana-born child's "adoptive parents." Given the unambiguous language of Louisiana's nondiscriminatory "Record of Foreign Adoptions" law, the only way the Registrar could constitutionally refuse to issue Appellees a revised birth certificate is if she did not believe the New York decree was valid. But the New York decree's validity is undisputed by the Registrar, as evidenced by her hindsight settlement offer to name either one of the Appellees—but not both—as an "adoptive parent" on Infant J's corrected birth certificate. The Registrar has, therefore, failed to give *full* faith and credit to the New York adoption decree in refusing to recognize the "adoptive parent" status that it conferred to Appellees.

### 4. The en banc majority opinion creates a circuit split.

The en banc majority superficially dismisses *Finstuen v. Crutcher* as "an outlier to the jurisprudence of full faith and credit,"[72] implicitly disrespecting the Tenth Circuit, as well as the State of Oklahoma and the district court where that case was filed, by failing to determine the jurisdiction to hear such a FF&C Clause case. In fact, though, *Finstuen* is both instructive and consistent with Supreme Court FF&C Clause jurisprudence. Oklahoma's existing law governing the effect of adoption decrees—quite similar to Louisiana's own birth certificate law—specified rights to holders of final adoption decrees. Generally, Oklahoma law stated:

> After the final decree of adoption is entered, the relation of parent and child and all the rights, duties, and other legal consequences of

state is constitutionally entitled.

[72] En Banc Majority Opinion at 16.

the natural relation of child and parent shall thereafter exist between the adopted child and the adoptive parents of the child and the kindred of the adoptive parents. From the date of the final decree of adoption, the child shall be entitled to inherit real and personal property from and through the adoptive parents in accordance with the statutes of descent and distribution. The adoptive parents shall be entitled to inherit real and personal property from and through the child in accordance with said statutes.[73]

Oklahoma only differed from Louisiana, however, in that Oklahoma's legislature forthrightly enacted an additional statute that excluded specific subsets of out-of-state adoptive parents from entitlement to the benefits conferred by the general adoption law. Oklahoma's "non-recognition" statute provided:

The courts of this state shall recognize a decree, judgment, or final order creating the relationship of parent and child by adoption, issued by a court or other governmental authority with appropriate jurisdiction in a foreign country or in another state or territory of the United States. The rights and obligations of the parties as to matters within the jurisdiction of this state shall be determined as though the decree, judgment, or final order were issued by a court of this state. **Except that, this state, any of its agencies, or any court of this state *shall not recognize* an adoption by more than one individual of the same sex from any other state or foreign jurisdiction.**[74]

As a result, out-of-state adoptive parents, like Appellees, who should normally have been able to have their rights as adoptive parents recognized under the general Oklahoma law, were prevented from doing so by this Oklahoma statute's mandate of non-recognition of only particular—but not all—out-of-state adoption decrees.

---

[73] OKLA. STAT. tit. 10, § 7505-6.5(A).

[74] OKLA. STAT. tit. 10, § 7502-1.4(A) (emphasis added).

In essence, the practical effect of the Registrar's policy of non-recognition is the same as that of Oklahoma's statute, which the Tenth Circuit invalidated in *Finstuen*. Like Oklahoma's general adoption statute, Louisiana's general enforcement provision is nondiscriminatory; and like Oklahoma's non-recognition statute, the Registrar's specific and exceptional "policy" is indisputably discriminatory. It is that discrimination that ultimately prevented Appellees from obtaining the revised birth certificate that otherwise they would have been able to obtain but for the Registrar's refusal to "accept"—give full faith and credit to—their valid out-of-state adoption decree for purposes of Louisiana's otherwise nondiscriminatory law.

Consequently, the en banc majority makes a flawed distinction when it asserts that "[t]he bulk of the [*Finstuen*] opinion is devoted to analysis of the allegedly unconstitutional state non-recognition statute, a problem different than the one here."[75] This blesses Louisiana's cynical ploy of having its Registrar and Attorney General do, by *executive* fiat, that which the Tenth Circuit ruled Oklahoma's *legislature* could not do statutorily. In fact, by invalidating a statute as violative of the FF&C Clause, the Tenth Circuit clearly read the FF&C Clause as binding on every branch of a state's government, and not just on state judges, which is in direct tension with the en banc majority's reading of the FF&C Clause.

The en banc majority's holding, therefore, is in undeniable conflict with the Tenth Circuit's opinion, which ultimately held: "Because the Oklahoma statute at issue categorically rejects a class of out-of-state adoption decrees, it violates

---

[75] En Banc Majority Opinion at 15.

the Full Faith and Credit Clause."[76] Here, the Registrar's uncodified policy of categorically rejecting , i.e., not "accepting," one subset of out-of-state adoptions violates the FF&C Clause in precisely the same way as did the now-stricken Oklahoma non-recognition statute. The en banc majority's holding to the contrary has thus created a circuit split—and comes down on the wrong side of it in the process.[77]

## B. The Equal Protection Claim

The en banc majority refuses to acknowledge that there are important prudential reasons for this appellate court—sitting en banc at that—to refrain from adjudicating Appellees' Equal Protection claim before the district court or even a panel of this court has done so. Although we do have jurisdiction over that claim, and although the parties have fully briefed it to the en banc court, we should have refrained from being the first court to rule on it. This is because, *inter alia*, (1) the Registrar never moved for summary judgment on the Equal Protection claim in district court, and (2) the district court never addressed it.

The only time we should ever reach an issue that was not first decided in the district court is when such issue presents a pure question of law the "proper resolution [of which] . . . is beyond any doubt."[78] As I respectfully but strongly disagree with the en banc majority's conclusion that the proper resolution of

---

[76] *Finstuen*, 496 F.3d at 1141.

[77] In addition, the en banc majority is simply wrong to claim that "[o]nly one federal court decision has permitted a full faith and credit claim to be brought in federal court pursuant to § 1983," citing *Finstuen*. En Banc Majority Opinion at 15. The Seventh Circuit too has allowed a plaintiff to bring a claim under § 1983 against state actors for violating the FF&C Clause. *See Rosin*, 599 F.3d at 575.

[78] *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 697 (5th Cir. 2002).

No. 09-30036

Appellees' Equal Protection Clause claim is purely legal and its resolution is beyond doubt, i.e., wholly without merit, I shall address it briefly if for no other reason than to demonstrate that the resolution of this claim is definitely not "beyond any doubt."

### 1. The Registrar's denial of an accurate birth certificate to Appellees is not rationally related to Louisiana's interest in furthering in-state adoption by married parents.

Rational basis review directs that a challenged state action be sustained "if the classification drawn by the [action] is rationally related to a legitimate state interest."[79] Here, Appellees challenge the Registrar's policy of denying an accurate birth certificate—for a Louisiana-born child adopted outside of Louisiana—reflecting both out-of-state unmarried, adoptive parents. Appellees constitutionally challenge that policy as applied to them. To frame this issue properly, we must remain mindful that Appellees are challenging neither (1) Louisiana's birth certificate statute, which is facially neutral as to the marital status of adoptive parents, nor (2) Louisiana's adoption laws, which are entirely inapplicable and unaffected here. Appellees only challenge the executive-branch policy declared by the Registrar.

The Registrar has identified Louisiana's interest as "preferring that married couples adopt children" because "a marriage provides a more stable basis for raising children together than relationships founded on something other than marriage." Without any further analysis, however, the Registrar then conclusionally states that her action was rationally related to that interest because "[i]f it is rational to conclude that it is in the best interest of adoptive

---

[79] *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

No. 09-30036

children to be placed in a home anchored by both a father and a mother, then it is also rational to allow birth certificates to reflect only married couples as 'adoptive parents.'" *But wait: something just does not add up*!

Undoubtedly, the Registrar (and the en banc majority) has tendered a worthy defense of Louisiana's in-state *adoption* laws, which prohibit *Louisiana* adoptions by unmarried couples. But, *the instant case does not involve a Louisiana adoption at all and poses no threat whatsoever to Louisiana's adoption laws or adoption policy*. The one and only thing that Appellees have ever challenged is the Registrar's refusal to accept—recognize—their valid out-of-state adoption decree so they may obtain a Louisiana birth certificate that accurately reflects their legal status as adoptive parents—pursuant to and wholly consistent with Louisiana's *Vital Statistics Laws*.[80] Appellees' claim has absolutely nothing to do with adoption laws—particularly not Louisiana's adoption laws as found in the *Louisiana Children's Code*[81]—and has everything to do with ensuring that the applicable Louisiana public records contain accurate and complete information, pursuant to Louisiana's Vital Statistics Laws, as found in its *Revised Statutes*. Because the Registrar's policy does not affect Louisiana adoptions, the governmental interest served by her refusal to issue a birth certificate reflecting both unmarried out-of-state adoptive parents *must* extend beyond a defense of Louisiana's *adoption* laws.

Another crucial and controlling fact here is that the Registrar did not take the challenged action here until well *after* Appellees had adopted Infant J and

---

[80] "Vital Statistics Laws" are Chapter 2 of Title 40, "Public Health and Safety," of Louisiana's Revised statutes. *See generally* LA. REV. STAT. ANN. §§ 40:32-356.

[81] *See* LA. CHILD. CODE ANN. arts. 1198, 1221.

No. 09-30036

taken him into their home outside Louisiana. So, there is no way that the potential stability of Infant J's home could have been improved by the Registrar's post hoc action.[82] Consequently, because the Registrar has failed to offer a *single* reason—specific to issuing a birth certificate—how her action is at all related to a legitimate governmental interest, Appellees' Equal Protection claim has at least arguable legal merit. As such, our longstanding prudential practice demands that this challenge be considered first by the district court, where it has never been addressed. Prudence and precedent confirm that this en banc court should refrain from deciding Appellees' Equal Protection Clause claim and instead remand it for the district court to take the first crack at it.

      **2.   The correct Equal Protection Clause comparator to Appellees is "unmarried biological parents," not "married adoptive parents."**

Confirming the impropriety of the en banc majority's failure to remand the Equal Protection Clause claim to the district court is the presence of a serious controversy regarding the rational basis test. Here, there is no way for the Registrar to pass that test when the correct comparator—"unmarried biological parents"—is used. Up to now, the entire Equal Protection analysis has been made on the assumption that the relevant comparator class to Appellees is couples who are "married non-biological parents," a subset of out-of-state adoptive parents to whom Louisiana readily issues birth certificates without

---

[82] If anything, there is an argument that denying Appellees an accurate birth certificate will actually make Infant J's home *less* stable because of the hardships and tensions that it inevitably could impose on Infant J's parents. These include, without limitation, those specific injuries advanced in the district court and before the panel, e.g., medical insurance inclusion, issue-free travel, etc.

No. 09-30036

restriction. But that is a baldly flawed assumption: The appropriate comparator class is the one comprising couples who are "unmarried biological parents."[83]

By statute, Louisiana recognizes and issues birth certificates to unmarried biological parents, irrespective of its proffered policy preference that children only have parents who are married to one another. And nothing in this provision conditions issuance of such birth certificates on the biological parents' maintaining a common home. Just as the unmarried Appellees are unquestionably the legal parents of Infant J by virtue of the New York adoption decree, Louisiana cannot control or change the fact that, both in and outside Louisiana, unmarried couples do give birth to children, and that they do so with increasing frequency—undoubtedly with much greater frequency than unmarried couples adopt. Properly framed, then, the predicate Equal Protection question is, how does Louisiana treat unmarried couples who wish to be named as parents on their biological children's birth certificates?

Louisiana law states:

> If a child is born outside of marriage, the full name of the father shall be included on the record of birth of the child only if the father and mother have signed a voluntary acknowledgment of paternity or a court of competent jurisdiction has issued an adjudication of paternity.[84]

---

[83] This is not to say that I don't believe that Appellees have a viable claim under the Equal Protection Clause using "married non-biological parents" as a comparator, inasmuch as all out-of-state adoptive parents have *already* lawfully adopted the Louisiana-born children by the time that Louisiana's birth certificate law comes into play, making marital status irrelevant as a condition of the birth certificate. I am simply convinced that "unmarried biological parents" are the *better* comparator for purposes of this analysis, given that the issue *cannot* be "stability in the home" and *must* involve Louisiana's vital statistic laws, which already do reflect the parental status of unmarried couples, i.e., unmarried *biological* parents.

[84] LA. REV. STAT. ANN. § 40:34(B)(1)(h)(ii).

No. 09-30036

So, in Louisiana, an *unmarried* couple definitely *is* statutorily entitled to a birth certificate for their biological child, listing both of them as legal parents of that child, regardless of whether those parents share living quarters. The only prerequisite is that those parents or a court verify the accuracy of the information provided—precisely parallel to Louisiana's prerequisite of a valid certified copy of an out-of-state adoption decree to obtain a corrected Louisiana birth certificate.

Because Louisiana will issue a birth certificate listing both members of an *unmarried* couple as parents when they are the biological parents of the child, the Registrar must identify a legitimate government interest that is served by distinguishing between, and treating differently for purposes of issuing birth certificates, (1) a couple comprising unmarried non-biological *adoptive* parents and (2) a couple comprising unmarried *biological* parents, all of whom have equal parental rights under the law. The Registrar has defended her policy as a refusal "to recognize permanently in [Louisiana] public records a parent-child relationship that *cannot exist* under Louisiana law." But her statement is patently false: Some unmarried couples, viz., unmarried biological parents, *can* and *do* maintain parent-child relationships that are *recognized* under Louisiana law and are *recorded on* Louisiana birth certificates. This is expressly documented in Louisiana's statutes as well as in its public records. As such, it is at least strongly arguable that there is no legitimate governmental interest served by refusing to issue Appellees an accurate birth certificate, particularly given that, neither Louisiana law nor the Registrar prevents *all* unmarried couples from being named as parents on birth certificates in Louisiana's permanent public records.

71

No. 09-30036

What's the legal difference? Where's the Equal Protection? Can there be any question that the en banc majority erred in addressing and dismissing Appellees' Equal Protection Clause claim on the merits before that claim was heard and fully vetted by the district court?

— — — — —

For any and all of the foregoing reasons, I must respectfully dissent from the en banc majority's actions in (1) reversing the district court's holding on Appellees' Full Faith and Credit Clause claim and (2) deciding their Equal Protection Clause claims instead of remanding them to the district court for it to perform its essential function of being the *first* court to address all ripe and well-pleaded claims over which there is federal jurisdiction.